PATRICK J. ASCIONE (USB #6469)
**ASCIONE & ASSOCIATES, LLC**
4692 North 300 West, Suite 220
Provo, Utah 84604
Telephone: (801) 854-1200
Fax: (801) 854-1201
Email: patrick@ana-law.com
Attorney for Plaintiffs

---

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

---

| | |
|---|---|
| GREG ARNSON, and SARAH ARNSON a married couple; CASEY BILBRO and CAROL BILBRO, a married couple; DAVID PRESZLER and MARY PRESZLER, a married couple; MATT RIPPERTON and SHUFEN RIPPERTON, a married couple; STEPHEN HADLOCK and ALTHEA HADLOCK, a married couple; STEPHEN OATHOUT and SUZANNE OATHOUT, a married couple; | **[PROPOSED] FIRST AMENDED COMPLAINT** |
| Plaintiffs, | |
| vs. | |
| MY INVESTING PLACE L.L.C., a Utah Limited Liability Company; DAVID BURTON, an individual; ELIZABETH McCLEERY, an individual; TOP FLIGHT LENDING, a Colorado Trade Name; BRENT CLARKSON, an individual; WESTERN SITE SERVICES L.L.C., a Nevada Limited Liability Company; TRI GLOBAL TRADING COMPANY, L.L.C., a Nevada Limited Liability Company; TRI GLOBAL DEVELOPMENT, L.L.C., a Colorado Limited Liability Company, DON SNIDER, an individual; DAVID DRAKE, an individual; NORTH SHORE INVESTMENTS, L.L.C., a Nevada | Case No. 2:09-cv-00254-DB  Judge: Dee Benson |

|  | Limited Liability Company; and JOHN<br>DOES 1- 10.<br><br>     Defendants. |  |
|---|---|---|

COME NOW the Plaintiffs, by and through counsel undersigned, of the law firm

Ascione & Associates, LLC, and complain of Defendants and allege as follows:

## PARTIES, JURISDICTION AND VENUE

1. Plaintiffs Greg Arnson and Sarah Arnson (the "Arnsons") are residents of, and

   domiciled in, Utah County, Utah.

2. Plaintiffs Casey Bilbro and Carol Bilbro (the "Bilbros") are residents of, and

   domiciled in, Utah County, Utah.

3. Plaintiffs David Preszler and Mary Preszler (the "Preszlers") are residents of, and

   domiciled in, Davis County, Utah.

4. Plaintiffs Matt Ripperton and Shufen Ripperton (the "Rippertons") are residents

   of, and domiciled in, Utah County, Utah.

5. Plaintiffs Stephen Hadlock and Althea Hadlock (the "Hadlocks") are residents of,

   and domiciled in, Utah County, Utah.

6. Plaintiffs Steven Oathout and Suzanne Oathout (the "Oathouts") are residents of,

   and domiciled in, Adams County, Colorado.

7. Defendant My Investing Place L.L.C. ("MIP") is a Utah limited liability company

   located at 63 E. 11400 S. Suite 196, Sandy, UT 84070, with their registered agent

   located at 856 S. Sage Drive, Suite 2, Cedar City, UT 84720.

8. Defendant David Burton ("Burton") is an individual and on information and

belief is a resident of, and domiciled in, the State of Utah.

9.  Defendant Elizabeth McCleery ("McCleery") is an individual and on information and belief is a resident of, and domiciled in, the State of Utah.

10. Defendant Top Flight Lending is a Trade Name assigned by the State of Colorado, the true registrant being Brent Clarkson.

11. Defendant Brent Clarkson ("Clarkson") is an individual and on information and belief is a resident of, and domiciled in, the State of Colorado.

12. Defendant Western Site Services L.L.C. ("WSS") is a Nevada limited liability company with its registered agent listed at 1701 Rock Springs Drive #214, Las Vegas, NV 89128.

13. Defendant Tri Global Development L.L.C. ("Tri Global") is a Nevada limited liability company with its registered agent listed at 1701 Rock Springs Drive #214, Las Vegas, NV 89128.  Tri Global Development is also registered with the State of Colorado as a foreign limited liability company and lists its principal street address as 1160 S. Lipan, Denver, CO 80223.

14. Defendant Tri Global Trading Company L.L.C. is a Nevada limited liability company with its registered agent listed at 1701 Rock Springs Drive #214, Las Vega, NV 89128.  Tri Global Trading Company is also registered with the State of Colorado with its principal street address as 1160 S. Lipan, Denver, CO 80223. On information and belief, it is assumed that Tri Global Trading Company and Tri Global Development are for all intents and purposes the same entity and alter egos of one another.  As a result, Plaintiffs will refer to both in this Complaint as

Tri Global.

15. Defendant Don Snider ("Snider") is an individual and on information and belief is a resident of, and domiciled in, the State of Colorado.

16. Defendant David Drake ("Drake") is an individual and on information and belief is a resident of, and domiciled in, the State of Colorado.

17. Defendant North Shore Investments L.L.C. ("North Shore") is a Nevada limited liability company with its registered agent listed at 1701 Rock Springs Drive #214, Las Vegas, NV 89128.

18. Defendant Charger Title Insurance Agency, Inc. ("Charger") is a Utah corporation with an office located at 1325 S. 800 E. Orem, UT, 84097 and their registered agent located at 3400 N. Ashton Boulevard, Suite 100, Lehi, UT 84043.

19. John Does 1-10 are individuals or business entities who have yet to be identified but are suspected of being directly involved with the substance of this complaint.

20. Jurisdiction is proper in this Court pursuant to 28 USC § 1331, Section 20(a) of the Securities Act of 1933 ("Securities Act") [15 USC § 77 v(a)], and Section 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 USC § 78 aa].

21. Venue is proper in this Court pursuant to 28 USC § 1391 (b)(2), Section 20(a) of the Securities Act [15 USC § 77 v(a)], and Section 27 of the Exchange Act [15 USC § 78 aa].

## GENERAL ALLEGATIONS

22. In 2006 Defendant MIP, a company which provided real estate investment opportunities, made several presentations along the Wasatch front to different

groups such as the Salt Lake Real Estate Investors Association, Wasatch Area Real Estate Investors Association, and the Utah Creative Real Estate Association.

23. These initial presentations led to several meetings hosted by MIP which were usually held on a monthly basis. The meetings were typically held at the Larry H. Miller Entrepreneur Center in Sandy, Utah.

24. The majority of these presentations were made by Defendants McCleery and Burton who were agents of MIP.

25. During these presentations MIP would present several different strategies on how to increase wealth, effectively leverage credit, and get out of the "rat race" through low risk investment opportunities with high yields.

26. MIP pushed its strategies as those used by Donald Trump which allowed him to develop his extensive real estate holdings.

27. One of the strategies presented by MIP was to join in a partnership agreement with them as a "credit partner."

28. MIP presented the credit partner arrangement as extremely low risk, that it required no money but only use of credit, and yielded an upfront payment or residual income based on the set-up of the arrangement with MIP.

29. MIP would use the individual's credit to secure a construction loan in the individual's name; and with those funds purchase land and finance a real estate development project. MIP would also secure permanent financing with the individual's credit.

30. Once the project was complete, MIP would transfer the construction financing to

permanent financing, sell the project, pay off the permanent loan with the proceeds from the project, and MIP would keep the profit if it had made the up front payment (MIP would offer a $10,000.00 payment on a complete duplex, or $5,000.00 for one unit in the duplex), or profit share on the project if the investor had selected that option.

31. Plaintiffs became involved in this type of arrangement with MIP on a project in Branson, Missouri.

32. Defendants McCleery and Burton presented the Branson, Missouri project to Plaintiffs in several of the meetings hosted by MIP.

33. Defendant Clarkson also attended some of these meetings as he was a loan officer and would explain how he would help the Plaintiffs secure the necessary financing and help them work with banks or other funding companies.

34. Defendants Drake and Snider also attended some of the meetings as representatives of WSS, who was the construction partner on the project, and explained how WSS would provide the necessary experience to insure the construction project was completed in a timely and efficient manner.

35. During the course of the Branson project WSS changed its name to Tri Global.

36. The Branson project consisted of a large condominium development in West Branson, Missouri.

37. The condominiums were set up as duplexes and investors were offered $10,000.00 for each duplex they were able to finance or in the alternative a profit sharing arrangement as owner of the duplex which would be used as a

rental/vacation property.

38. MIP and WSS increased the appeal of the Branson project by explaining that parts of the framing for the condominiums were pre-fabricated[1] so the project would move quickly and condominiums would be completed in three to four months.

39. MIP and McCleery represented that the average family could finance four duplexes each year which would either provide $40,000.00 to the family for simply using their credit, or create a residual income stream from four rental/vacation properties per year.

40. McCleery explained that the Branson project was attracting several investors and that if individuals wanted to be involved they would need to pay a reservation fee of $3,000.00 per unit[2], but that the reservation fee would be fully refundable if the individuals moved forward with the project and secured the necessary financing.

41. McCleery also explained that MIP would facilitate the process of obtaining financing and would work directly with the lenders to minimize the amount of time and effort needed from the individual investors in securing the loans.

42. Each Plaintiff decided to become involved in the Branson project and entered into a credit partnership agreement which was to either pay the $10,000.00 up front per duplex financed, or create a profit share arrangement on the unit with MIP.

43. Each Plaintiff's experience followed basically the same path, with some small differences.

---

[1] It was later discovered that this representation was false and none of the framing materials were pre-fabricated.
[2] The term unit is used to mean one half of a duplex, often referred to as a door in the investment documents. A complete duplex would be two units.

## Greg and Sarah Arnson

44. The Arnsons entered into the credit partnership agreement with MIP in 2006.

45. Per the terms of the agreement the Arnsons were required to proceed with application for a mortgage on real property, using their social security numbers and credit.

46. The agreement also required the Arnsons to fill out the necessary applications, provide required documents, attend the closing, and take all necessary steps to secure the mortgage.

47. The agreement required MIP to pay the Arnsons $10,000.00 per duplex financed and to make all payments on the mortgage note.

48. The Arnsons initially signed up for one duplex as a credit partner, but later added a second as a credit partner and planned on receiving $10,000.00 for use of their credit.

49. In order to reserve the spots, the Arnsons paid $6,000.00 to MIP to reserve the first duplex[3].

50. After entering into the agreement with MIP the Arnsons began the process of working with MIP and Clarkson to secure the financing for the project.

51. The Arnsons began exchanging several emails with McCleery and Clarkson to gather the necessary information to prequalify for the required financing.

52. The Arnsons provided all of the requested information which consisted of the typical documents needed for loan approval: tax returns, pay stubs, bank

---

[3] The reservation fee was $3,000.00 per door or unit or $6,000.00 per duplex.

statements, etc.

53. During this same time period the Arnsons received updates from McCleery on the
    status of the Branson project as well as plat maps and other information needed to
    secure the loans.

54. In late August 2006 and early September 2006, the Arnsons were able to pick out
    their lots in the project and shortly thereafter received appraisals on them.

55. Originally the financing was to be obtained through Top Dot lending company,
    however, on December 4, 2006, the Arnsons were informed MIP would be
    moving forward with new banks and would no longer be working with Top Dot.

56. On December 8, 2006, the Arnsons were notified that MIP was moving forward
    with Columbian Bank out of Kansas.

57. MIP provided the Arnsons with a Personal Financial Statement form and
    requested that they fill it out and return it along with other requested
    documentation.

58. Clarkson worked directly with the bank on the loan and all documents and
    applications were funneled through Clarkson to Columbian Bank and other
    lending institutions.

59. On January 31, 2007, McCleery notified the Arnsons that they had received
    approval from Columbian Bank on the Branson project.

60. On February 9, 2007, the Arnsons went to Charger Title and executed a Warranty
    Deed for the property in Branson. The Warranty Deed conveyed title to the

Branson property from Northshore Investments LLC[4] to Greg and Sarah Aronson.

61. The project appeared to be moving forward just as planned, and the Arnsons applied for a second unit.

62. Beginning in February 2007, Snider and Drake made regular trips to Utah to update investors on the Branson project and inform them of other projects WSS/Tri Global was beginning.

63. On March 21, 2007, the Arnsons received an email from WSS updating them on the project explaining that roads were going in and WSS was gearing up to begin excavation work on the lots.

64. The email also informed the Arnsons that as owners of the property in Branson they would be receiving a form from the Stone County Assessor's Office.  The email assured the Arnsons that they did not have to fill out the form or worry about any fees; that WSS would take care of all of that.

65. Also on March 21, 2007, the Arnsons received an email from MIP explaining that there had been some complications with financing, but that a letter from Clarkson was attached explaining the situation.

66. The email went on to say that the letter shows financing at 90% loan to value ("LTV"), but that the true cost was 85% LTV and that Clarkson had made the change so not as many assets would be required to secure the loan.  MIP explained that the 5% would never be drawn, that when the construction was complete the 5% would go back to the bank and everything would be fine.

---

[4] Northshore Investments LLC is the company which owned all of the property in the Branson project. Interestingly, Northshore Investments LLC is owned by the same principals as WSS.

67. The attached letter from Clarkson explained that due to delays with Columbian Bank he was pursuing new lenders. Clarkson outlined the new guidelines explaining the sales price would equal the value of the unit, all construction loans will be at a 90% LTV, all construction loans would be Stated Income/Verified Asset loans, and that 10% down would be required at closing.

68. Clarkson explained they would still not be required to put any money in, and that a third-party would deposit that money into their personal checking account. Clarkson emphasized that the lending sources "DO NOT need to know the down payment is coming from a third party source."

69. The letter also stated that all interest payments on the loan will be covered by the builder.

70. On May 4, 2007, the Arnsons received an email from WSS outlining the progress on the Branson project.

71. The email explained that:

   a. "foundations should start in 2 weeks, with home deliveries in about 3-4."

   b. "a few of the lots [were] loaded in the MLS so that presales on the finished product can begin! They have a ton of interest, and we expect a huge boom when the first structures are erected within the next 45 days!"

72. Throughout May and June 2007, the Arnsons received several emails from MIP and Clarkson explaining problems with closing the financing on the project. These problems were blamed on increased regulation from the government.

73. On July 10, 2007, Clarkson sent the Branson contracts to the Arnsons and the

authorization form from Wells Fargo for them to sign for the closing.

74. The contracts showed that a down payment needed to be made, but MIP assured the Arnsons that the payment would be made for them and that no money would come out of their pocket.

75. As a result of the delay in securing financing, the Arnsons signed contract extensions on July 31, 2007, with Northshore Investments which currently owned the property and was affiliated with WSS/Tri Global.

76. On August 13, 2007, the Arnsons received an email from Clarkson explaining that he had stated their monthly income as $21,000.00 "to cover all debt and make the ratios work." He explained that "if the info is pretty close to being correct you won't hear from Wells Fargo."

77. On August 31, 2007, the Arnsons received an update on the construction progress of the Branson project explaining that excavation was moving forward and that "we will set the first 14 duplexes in 3-4 weeks."

78. On September 4, 2007, the Arnsons received the permit application for their lots, which they promptly completed and returned.

79. On September 6, 2007, the Arnsons secured the required insurance on the project and had the policies forwarded on to Wells Fargo and WSS.

80. On September 10, 2007, the Arnsons received another update on construction progress of the Branson property and an assurance that the delays in financing had not stopped progress on the development.

81. On September 12, 2007, the Arnsons received an email requesting that once they

received payment coupons for the loan that they immediately forward them on to
WSS so that WSS could make the loan payments without delay.

82. On September 18, 2007, the Arnsons received notice from Clarkson that they had
received approval from Wells Fargo to close, and closing was finally
accomplished on or about September 20, 2007.

83. The Arnsons signed closing documents at Charger Title on or about September
20, 2007.

84. On September 19, 2007, MIP cut a check for $10,000.00 to the Arnsons.

85. The Arnsons continued to receive updates on the Branson project explaining that
work was moving forward and on January 14, 2008, pictures of the first framed
duplexes were sent out with assurances that the 78 additional duplexes would be
going up soon.

86. Based on the apparent progress of the development the Arnsons continued
forward with securing financing on the second duplex and applied for two loans
through Columbian Bank for $388,000.00 each.

87.  The Arnsons once again worked exclusively through Clarkson and MIP to
secure these loans and all documents were funneled through Clarkson to
Columbian Bank.

88. On February 27, 2008, the Arnsons received notice that WSS was now Tri Global
and that all work previously carried out by WSS would be performed by Tri
Global.

89. After this announcement Tri Global began sending periodic news letters updating

the progress of the Branson project showing pictures of duplexes being built.

90. These news letters gave the impression that work was moving forward on the project and that each individual duplex was well on its way to completion.

91. On March 4, 2008, the Arnsons received an email from McCleery informing them that work on the project had been delayed due to severe weather and that the Arnsons' lot would be one of the last to be completed.

92. McCleery reassured the Arnsons that this would not be a problem and that Clarkson would work with the bank to transfer their project to a lot which would be completed sooner.

93. On March 24, 2008, the Arnsons were informed that Columbian Bank had approved the transfer of lots and that their new lot was 40AB and that the change would accelerate the construction of the duplex they were financing.

94. On May 1, 2008, Tri Global provided documentation which they represented would transfer all obligations previously owed by WSS to Tri Global and that all projection costs and draw sheets would remain the same.

95. The Arnsons were concerned about language in the contracts dealing with buying the units for the appraised value instead of for the LTV value and questioned McCleery about this.

96. McCleery explained that the differences were because MIP or the builder had made the down payments and that the contracts had to be for the full value because the equity from the down payment had to be included.

97. McCleery assured them that everything was fine and that the transition from WSS

to Tri Global would not cause any change in the project or their relationship to the project.

98. Throughout the Spring of 2008 the Arnsons received repeated notices that construction was behind schedule due to extreme weather and that if the lenders contacted them about progress statements to forward them on to Tri Global and that it would be handled.

99. Tri Global and MIP continued to act as the intermediary between the Arnsons and the lending institutions.

100.    On August 25, 2008, the Arnsons received notice from the FDIC that Columbian Bank had been closed by the State Bank Commissioner of Kansas and that the FDIC had been appointed as receiver.

101.    On September 1, 2008, the Arnsons received an email from McCleery notifying them of her resignation from MIP.  She stated the reason for her departure was lack of access to proper information which resulted in her not being able to do her job correctly.  The email notified the Arnsons that all future communications should be made with Burton.

102.    After the FDIC took control of the Columbian Bank all construction distributions were stopped and the accounts were frozen.  As a result, on September 17, 2008, the Arnsons received an email from Drake of Tri Global explaining that since there were no more construction distributions that Tri Global would no longer be making the interest payments on the loans as originally promised.

103.     In this same email, Drake attempted to blame the FDIC for the failures of

the Branson project and stated that "Everyone should be angry at the way the

FDIC is handling this" and went on to say that "it is wrong to shut construction

loans off midstream."[5]

104.     This resulted in the Arnsons being required to make interest payments in

order to prevent their loans from going into default and negatively effecting their

credit.

105.     It was later discovered that much of the construction work which had been

represented by MIP and WSS/Tri Global to have been completed had not been

and the construction distributions which had been issued by Columbian Bank and

Wells Fargo had not gone towards the construction of the project as represented.

106.     On information and belief, it is Plaintiffs' understanding that the money

was used to pay the interest payments on the bank loans (as interest payments

stopped being made the instant construction distributions stopped) and the

majority of the moneys not used for interest payments were pocketed by MIP

and/or WSS/Tri Global.

107.     In order to remedy the situation which had been created by MIP and

WSS/Tri Global's failure to make the interest payments as promised and finish

the project, the Arnsons began negotiating with a possible third party to purchase

the project.

108.     However, nothing resulted from these negotiations and the Arnsons were

---

[5] This statement may have carried some validity had the construction loan disbursements actually gone towards construction of the duplexes for which they were specifically designated.  However, it was later discovered that this was not the case.

left with loan obligations of approximately $223,000.00 per unit on four units and
the accompanying interest payments, but the construction on their units had not
even begun.

109.    On October 15, 2008, the Arnsons received loan extension documents
from Wells Fargo to postpone the loans being called due as the Arnsons sought a
resolution of the problem.

110.    On November 24, 2008, the Arnsons received a Formal and Final Demand
from the FDIC calling the two loans previously held by Columbian Bank due.
The amounts owing on the first loan from Columbian Bank was $296,066.26 and
the second loan from Columbian Bank was also $296,066.26.

111.    On December 1, 2008, the Arnsons received a similar letter from Wells
Fargo stating they were in default on the two loans from Wells Fargo, and failure
to correct that default would result in the loans being called due on January 1,
2009.

112.    On January 21, 2009, the Arnsons received a follow-up letter from Wells
Fargo seeking repayment of the entire amount due on the two Wells Fargo loans;
the first in the amount of $229,297.14, the second in the amount of $232,423.53.

113.    As a result of entering into the agreement with MIP which was to provide
them a completely finished and furnished duplex and $10,000.00 for the second
duplex for allowing MIP to use their credit, the Arnsons had loans being called
due which totaled $1,053,853.10 and all they had to show for it was two
unfinished lots in West Branson, Missouri.

**Casey and Carol Bilbro**

114.     Casey and Carol Bilbro became directly involved with the Branson

Missouri project with MIP in July 2006.

115.     On July 5, 2006, MIP sent four reservation agreements to Casey for him to

sign along with a request for $12,000.00 to secure his reservations.

116.     Casey promptly filled out the reservation agreement and sent a payment to

MIP for $12,000.00.

117.     McCleery confirmed receipt of the requested information and payment on

July 14, 2007, and informed Casey that Clarkson should already have his

documentation for the loan to secure financing for the four units.

118.     Casey's pre-qualification documents for the loans were submitted on July

20, 2006, by MIP and Casey was informed by McCleery that he should expect a

phone call from Clarkson and that Clarkson would be handling all of the

arrangements to secure financing.

119.     Over the next month, Casey received updates on the progress of the

Branson project and was sent a plat map to pick out his lots.

120.     On August 23, 2006, MIP informed Casey that Top Dot would be doing

appraisals on the property within the week in order to secure the loans.

121.     On September 14, 2006, MIP informed Casey that the appraisals had been

completed and that they were higher than anticipated.  MIP explained this meant

that Casey would be experiencing greater returns on his investment and that once

construction was complete he would be able to immediately have access to

$45,050.00 per lot.

122.     The next day MIP provided Casey with an exit strategy for his investment and outlined how there were no real risks with his investment.

123.     On October 6, 2006, Casey received an email from MIP explaining that the first closing group was ready and that he should have received a construction contract.  The email explained that the construction contract was for the builder and bank and showed a breakdown of the costs and how the money would be disbursed.

124.     The email explained that any earnest money or upfront payments would be covered by the builder and that he would not be required to put any money into the investment.

125.     On October 9, 2006, MIP sent an email to Casey informing him that property values in the area had increased 20% as a result of a new water park going in the area and increased rental rates at other properties in the area.

126.     On November 1, 2006, Casey sent an email to McCleery clarifying that he was only involved as a credit partner because it was much safer and there was less risk and that he was downsizing from two full duplexes to just three units or one and a half duplexes and requested return of a $3,000.00 reservation deposit.

127.     At approximately this same time, Casey sent in all of the requested documentation to Top Dot to secure the financing for the project.

128.     On November 15, 2006, MIP sent out a notice that five new banks were looking at financing the project and that this could result in better rates and lower

fees so the financing would no longer be with Top Dot.

129.      On November 30, 2006, MIP notified Casey that over 200 buyers were interested in purchasing the properties he had invested in and that the project would be a great success.

130.      On December 8, 2006, MIP notified Casey that Columbian Bank would be the bank providing the financing.

131.      On January 2, 2007, MIP notified Casey that he would be receiving his payments for being a partner on the project within 30 days.

132.      On January 25, 2007, MIP notified Casey that Clarkson was working directly with Columbian Bank and that closing should be occurring in the very near future.

133.      At the beginning of February 2007, Clarkson began contacting Casey and requesting additional information to secure the financing with Columbian Bank.

134.      On March 21, 2007, Casey received the email from MIP notifying him of the change in the set up of the financing and that the LTV would be for 90%, but that the cost to him would still be 85% LTV so that he would not have to show an additional $25,000.00 in assets per door to qualify for the loans.

135.      The email assured him that there were no problems with this arrangement and contained an attached letter from Clarkson further explaining the arrangement.

136.      The letter from Clarkson explained the sale price would equal the appraised value, all construction loans would be 90% LTV, a 10% down payment

would be required at closing, but would be made by a third party, and that the banks "DO NOT need to know the down payment is coming from a third party, and that all interest on the loan would be paid by the builder.

137.     MIP continued to send Casey updates on the project explaining what a huge success it would be based on the number of visitors travelling to Branson.

138.     On May 4, 2007, MIP sent Casey an email explaining they may be using Wells Fargo as a lender and that one of the duplexes may be financed through Wells Fargo.

139.     On May 7, 2007, Casey received an update from MIP explaining the builders had met with the developer and that foundations would start going in within two weeks.

140.     On May 25, 2007, Casey received a Good Faith Estimate of Settlement Costs from Wells Fargo and that the bank would be combining two of his loans into one and that this would cover two of his three units.

141.     On June 14, 2007, MIP notified Casey that the project was progressing nicely and that: all of the engineering had been checked off; they were approximately two months from completing the infrastructure; and that development of a water park and amusement park in the area was improving property appraisals.

142.     On June 21, 2007, MIP notified Casey that Wells Fargo had agreed to finance one complete condominium for him and that one side would be financed by Wells Fargo Bank, and the other side would be financed through Wells Fargo

Home Loans, and that the loan files would be sent to them immediately.

143.     On June 27, 2007, Casey was notified by Wells Fargo that subordinate

financing had been approved and that a home equity loan for $48,500 would be

paid at closing.

144.     On the same day, Wells Fargo sent several documents for Casey to sign in

order to move forward with the loan, and the next day Clarkson sent a credit form

for credit authorization for Wells Fargo.

145.     On July 3, 2007, Casey received notice from MIP that MIP had received

approval on some of the lots and closing would begin next week.

146.     On July 20, 2007, Wells Fargo sent a draw request to Casey for his

signature authorizing a total withdrawal of $55,058.20 for Water/gas/sewer hook-

up, lumber, survey, and permits.  Casey signed these documents and returned

them fully expecting the money to be used for the items as listed on the

documents.

147.     It was later discovered that the money was not used for these purposes.

148.     On or about July 25, 2007, the closing was carried out at Charger Title and

the warranty deed was subsequently filed with Stone County Missouri on August

6, 2007.

149.     On July 27, 2007, Casey received documentation from Hogan Land Title

Company on the loans from Wells Fargo for lots 78A and 78B.

150.     The documentation showed that the borrower had paid $55,147.00 on the

first loan and $53,845.50 on the second loan.  In reality this had been paid by

either MIP or WSS per Clarkson's instructions, and the bank had to have been aware of this as they accepted payment and Casey nor his wife Carol ever made any payments.

151.     On August 1, 2007, Clarkson sent Casey a request for disbursement from Jenna Fullerton at Wells Fargo authorizing a disbursement of $88,120.00. Casey signed this and returned it promptly believing it would be used for the construction of his units.

152.     On August 6, 2007, Casey was notified by MIP that closing had taken place on his project and that he should be receiving his partnership check within the week.

153.     At this time Casey began to receive regular updates from WSS updating him on the progress of the development.

154.     On August 31, 2007, WSS informed him that construction was progressing nicely and that roads were going in.

155.     On September 4, 2007, Casey received permit applications which he promptly signed and returned to WSS.

156.     On September 11, 2007, Casey received his partnership payment from MIP in the amount of $9,842.50 which covered his $10,000.00 payment and $6,000.00 reservation refund, minus the title checks received from Hogan Title and title fees.

157.     On September 12, 2007, Casey received a request from WSS to immediately send in any payment coupons he received from Wells Fargo as WSS

would make all of those interest payments.

158.     On October 10, 2007, Casey received a credit authorization request form from McCleery for the Lawrence Bank loan requesting that Casey sign the document and return it to Clarkson so that it could be processed with the bank.

159.     On October 12, 2007, McCleery sent financial statement forms for Casey to fill out with instructions that they be sent to Clarkson so that he could review them and then submit them to Lawrence Bank.

160.     On October 31, 2007, Casey received an email from MIP requesting that an address change be submitted to Wells Fargo so that all interest statements and required payments be sent directly to WSS.  Casey promptly made the changes as requested.

161.     On November 11, 2007, Casey received a Line Item Disbursement Schedule and Request form from Wells Fargo which stated in bold letters that "all disbursements will be released based on work completed as stated by a WFHM inspector."

162.     This information led Casey to believe that no money would be released by Wells Fargo unless the construction was progressing as represented by the builder.

163.     On November 29, 2007, MIP sent Casey the Real Estate Partner Agreement for his signature which clearly states that MIP "shall receive bills for and make all mortgage payments on the mortgage note."

164.     This document assured Casey that there would be no out of pocket

expenses for the Branson project.

165.    For the next several months, Casey continued to receive updates from WSS or Tri Global on the progress of the development which represented that the roads were in and building was moving forward on the project.

166.    On May 5, 2008, Casey received contracts from Clarkson which transferred all duties and obligations from WSS to Tri Global and made the conversion from WSS to Tri Global final.

167.    On July 11, 2008, Casey received another update from Tri Global on the progress of the Branson project.  This update differed from the past in that it gave information on a lot by lot basis.

168.    This update informed Casey that no actual construction had taken place on his lot, the foundation had not been poured, and excavation work still needed to be done.

169.    However, WSS/Tri Global had already made draws on the two loans for $139,700.00 and $225,102.00 but no actual construction had taken place.

170.    On August 25, 2008, Casey was sent a Change in Terms Agreement from Wells Fargo to extend the loan and to reduce the amount from $436,500.00 to $388,000.00 as the time period for the construction loan had expired.

171.    Shortly thereafter on September 1, 2008, Casey received notification from McCleery that she was resigning from her position at MIP.

172.    She represented that she was resigning because she was not being provided access to information which was necessary for her to perform her job

appropriately.

173.    In order to remedy the situation which had been created by MIP and

WSS/Tri Global's failure to make the interest payments as promised and finish

the project, Casey began negotiating with a possible third party to purchase the

project.

174.    However, nothing resulted from these negotiations and Casey was left

with loans of approximately $365,000.00 in exchange for nothing but a partially

excavated lot which was encumbered by several liens.

175.    On December 1, 2008, Wells Fargo sent a notice to Casey informing him

that he was in default and would need to cure that default before January 1, 2009,

in order to avoid collection proceedings.

176.    On January 1, 2009, Wells Fargo sent a Notice of Default and Demand for

Payment on Loan No. 0878408979-26 in the amount of $227,813.18.

**David and Mary Preszler**

177.    The Preszlers became directly involved in the Branson project in July

2006.

178.    On July 3, 2006, the Preszlers received an email from McCleery officially

announcing the Branson project.

179.    Shortly thereafter, the Preszlers provided McCleery with their payment

and reservation agreements.

180.    On July 13, 2006, the Preszlers sent their financial information to obtain

financing to McCleery.

181.    McCleery referred the Preszlers on to Clarkson and explained that he would be handling all of the work in obtaining the financing.

182.    On August 21, 2006, McCleery sent the plat map for the Branson project to the Preszlers so they could pick out their lot and move forward on the deal.

183.    On September 18, 2006, the Prezlers received additional financial information requests from Clarkson for Top Dot lending to secure financing for the project.

184.    On October 24 and 31, 2006, the Preszlers provided the requested information to Clarkson for the financing.

185.    On November 28, 2006, McCleery forwarded a letter from WSS to the Preszlers about the Branson project and the tremendous interest it was receiving from buyers.

186.    The letter explained the lack of risk and the security of making the investment.

187.    Throughout the second half of 2006 the Preszlers received periodic emails and updates from MIP and WSS informing them of the advantages of the investment and the tourist attractions going into the area.

188.    On March 5, 2007, Dave received an email request from McCleery that he provide additional financing information to Clarkson and explained that Clarkson would handle all financing with the banks or other lending institutions.

189.    On March 21, 2007, Dave received the email from MIP notifying him of a change in the set up of the financing and that the LTV would be for 90%, but that

the cost to him would still be 85% LTV so that he would not have to show an additional $25,000.00 in assets per door to qualify for the loans.

190. The email assured him that there were no problems with this arrangement and contained an attached letter from Clarkson further explaining the arrangement.

191. The letter from Clarkson explained the sale price would equal the appraised value, all construction loans would be 90% LTV, a 10% down payment would be required at closing, but would be made by a third party, and that the banks "DO NOT need to know the down payment is coming from a third party, and that all interest on the loan would be paid by the builder.

192. MIP continued to send Dave updates on the project explaining what a huge success it would be based on the number of visitors travelling to Branson.

193. On April 30, 2007, McCleery sent Dave an email explaining that closing on his financing should happen by mid May.

194. On June 22, 2007, McCleery notified Dave that the lender Clarkson had previously been using was no longer going to work and that MIP and Clarkson were pursuing financing from alternate lenders.

195. On August 13, 2007, Dave provided Clarkson with a loan application to be submitted to Top Flight lending.

196. Clarkson contacted Dave on the same day and requested that Dave make changes to the document and include additional information.

197. Dave complied with Clarkson's instructions and did everything he could

to facilitate closing the financing on the project.

198.     On August 23, 2007, Dave signed the construction contracts for the project with WSS, submitted the completed Top Flight loan application, and signed a Wells Fargo Credit Authorization form.

199.     On August 31 and September 14, 2007, McCleery sent additional updates on the Branson project showing excavation work and installation of roads in the development.

200.     On November 12, 2007, Dave sent a request to McCleery to withdraw from the investment and requested a refund of his $3,000.00 reservation fee.

201.     McCleery immediately denied the request and informed Dave that the only way he could get out of the agreement was if he failed to qualify for the loan.

202.     On December 7, 2007, McCleery finally provided Dave with the Credit Partner Agreement documents for his signature. Dave signed the MIP Partnership Agreement and secured a right to the $5,000.00 payment and additional assurances in the contract that all obligations on the loans obtained with Dave's credit would be paid by MIP.

203.     On December 17, 2007, Dave received an email from Clarkson explaining that the construction loan with Lawrence Bank had been approved and the permanent financing with Wells Fargo had also been approved.

204.     In the email Clarkson explained that in order to get the loans approved he had stated Dave's monthly income at $9,250.00 and Mary's monthly income from an LLC they owned at $3,000.00.

205.     Dave immediately responded to Clarkson's email saying that there was no
income from the LLC and that the information was not correct.

206.     Clarkson attempted to explain away the discrepancy that it was just the
way that Wells Fargo broke down the income.

207.     Dave responded by saying that he reviewed all of the information he had
provided and that the monthly income should still not be that high.

208.     Clarkson responded that the information had already been submitted to
Wells Fargo and Dave simply needed to state the values as Clarkson had reported.

209.     Dave responded that the information was not accurate and regardless of
whether Wells Fargo would ask for proof or not, he was not willing to perpetrate
the fraud Clarkson was requesting.

210.     Clarkson responded that was fine, but that the permanent financing might
have to be moved to another lender before the construction was completed.

211.     On or about January 15, 2008, closing on the loans took place at Great
Lakes Title Company in Missouri and on January 16, 2008, Dave received the
Warranty Deed for the property in the Branson project.

212.     Dave completed his part of the closing with Charger Title and was assisted
through the process by Leslie Peterson of Charger Title.

213.     During the closing process Dave was assured by Peterson that no money
down was required.

214.     Dave received the $8,000.00 payment owed to him shortly thereafter
which covered the $5,000.00 partnership fee and the $3,000.00 reservation fee.

215.     On February 19, 2008, Dave received the signed Real Estate Partner
Agreement with MIP from McCleery.

216.     During this time Dave continued to receive updates on the progress of the
development and assurances that work was moving forward on the project.

217.     On March 24, 2008, Dave received a loan payment notice from Lawrence
Bank indicating an interest payment was due on April 3, 2008, in the amount of
$1,556.08.

218.     Dave emailed this notice to McCleery and she assured him that she would
be sure that it was paid.

219.     Dave also received notification that WSS would be changing its name to
Tri Global.

220.     On May 5, 2008, Dave received contracts from Clarkson which transferred
all duties and obligations from WSS to Tri Global and made the conversion from
WSS to Tri Global final.

221.     On May 13, 2008, Dave received a notice from Lawrence Bank stating
that an interest payment of $1,506.37 was past due and now had a late charge of
$25.00.

222.     Dave once again forwarded this on to McCleery for payment.

223.     On June 6, 2008, Dave received an email from Clarkson explaining that
extension documents for the Lawrence Bank loan needed to be provided to
Lawrence Bank in order to stop foreclosure proceedings.

224.     Clarkson stated in his email that Dave did not need to be concerned with

the interest payments and that the builder would continue to make those payments

as he always had.

225.    On July 17, 2008, Dave received draw requests for signature from Tri

Global, which he signed and promptly returned believing that it was necessary to

keep the project moving and that the money was being used for construction on

his lot.

226.    On August 28, 2008, Dave received additional draw requests from Tri

Global which he also signed.

227.    On September 1, 2008, Dave received the notification from McCleery that

she was resigning from her position at MIP and would no longer be involved with

the company.

228.    She represented that she was resigning because she was not being

provided access to information which was necessary for her to perform her job

appropriately.

229.    In order to remedy the situation which had been created by MIP and

WSS/Tri Global's failures, Dave began negotiating with a possible third party to

purchase the project, however nothing resulted from these negotiations.

230.    On September 23, 2008, Dave received another payment notice from

Lawrence Bank for $1,086.38.

231.    Dave forwarded this on to Burton with MIP for payment, but was

informed that MIP would not be making the payment and that it was up to Tri

Global to make the payment.

232. On September 24, 2008, Dave received a letter from Lawrence Bank attorneys demanding interest payments be made.

233. The letter also made reference to a deposit or earnest money from the borrower on the loan and a deposit retained by the seller.

234. Dave was somewhat confused and perplexed by this language as he had received repeated assurances that he would not be required to put any money down for the project other than the $3,000.00 reservation fee.

235. Leslie Peterson at Charger Title had also assured him that this was the case and that no money was required at the closing.

236. Dave immediately contacted Lawrence Bank to inquire about this part of the letter and was informed by David Clark of Lawrence Bank that $97,000.00 had been wired from D. Preszler to Metropolitan National Bank.

237. Dave did not know anything about this and contacted Drake at Tri Global to find out what this was all about.

238. Drake informed Dave that all of the arrangements had been worked out with Lawrence Bank and that they were aware all payments were being made by a third party who was not Dave Preszler.

239. On December 4, 2008, Dave paid past due interest payments to Lawrence Bank in the amount of $4,652.22 in order to protect his credit and stop the bank from foreclosing on the Branson property.

240. Dave requested a loan activity statement from Lawrence Bank, as previous to this time all information had been sent to MIP or Tri Global. The loan activity

statement showed a total balance due of $332,023.00.

241.     Dave was very confused by this as he had only authorized two draws, one

for $53,174.00 and a second for $49,369.00, totaling $102,543.00.

242.     As a result of Dave's involvement with MIP and WSS/Tri Global Dave

had a loan in his name with a balance due of $332,023.00 and in return for that

amount of debt only had an interest in a partially excavated lot in Branson,

Missouri which was encumbered by several liens.

### Matt and Shufen Ripperton

243.     Matt and Shufen Ripperton became involved in the Branson project on

March 1, 2007.

244.     The Rippertons notified McCleery that they would like to become

involved in the Branson project on three units, or one and a half duplexes.

245.     The Rippertons elected to enter into the profit sharing agreement on one of

the units, and as a straight partner on the other two and receive a $10,000.00

payment for use of their credit on those two units.

246.     The Rippertons were attracted to the Branson project because of

representations made by MIP and McCleery that the construction of the units

would be completed very quickly, approximately three months, due to the fact

that much of the framing was pre-fabricated.

247.     On March 7, 2007, Matt made an inquiry to McCleery regarding the

financing of the project and if both he and Shufen needed to be included.

248.     McCleery responded that only Matt needed to be included and that only

his information would be necessary to secure financing for the project.

249.    On March 14, 2007, McCleery confirmed that she had received a check

for $6,000.00 from the Rippertons to reserve the units.

250.    Matt began the process of filling out the loan application forms and

providing the requested information to secure the financing.

251.    On March 19, 2007, Matt questioned McCleery as to why the loan

application he had been provided was pre-checked as a primary residence when

the properties were investment properties.

252.    McCleery responded that it was an inadvertent mistake.

253.    Matt crossed out the primary residence line and checked investment

property on the form which he then submitted on March 21, 2007.

254.    The first financial institution the Rippertons worked with on the Branson

project was New Century Bank.

255.    Matt had several conversations with Eric Moore of New Century about the

project and it became apparent that Moore did not know that the units were an

investment property nor that they would be sold on completion.

256.    Matt raised this issue with McCleery and she responded that the sale had

nothing to do with the bank and that the bank did not need to know.

257.    Matt was concerned about this, but MIP switched to alternate lenders and

did not use New Century so Matt no longer worried about the apparent lack of

communication between MIP and New Century.

258.    On July 10, 2007, Clarkson forwarded construction contracts and banking

information to the Rippertons.

259. McCleery sent a separate email explaining that the contracts showed a down payment being made, but that the down payment would be made by MIP or WSS and that the Rippertons did not need to be concerned with the payment.

260. Matt responded to the construction contracts with several questions, specifically regarding the absence of any contingency sections in the contract regarding inspections and financing.

261. On July 11, 2007, Clarkson responded to Matt's questions explaining that the contracts were contingent upon obtaining financing and if for any reason financing was not approved the contracts would be cancelled.

262. Based on this information, Matt signed and returned the contracts to MIP on lots 42A and 42B on the same day.

263. Matt also emailed McCleery to ask why the contract was only for two units when they had originally planned on doing three units. McCleery responded the next day explaining that the bank would only do two doors at one time.

264. On July 25, 2007, Matt sent corrected contracts to WSS. On the original contracts the purchase price had been noted as $441,000.00, which was the loan amount, instead of $490,000.00, which was the actual purchase price as the LTV was 90%.

265. On July 30, 2007, McCleery sent Matt an update on the project explaining that the land improvements had been moving forward on all of the lots, that the roads were almost complete and that foundations should start going in soon.

266.    It was later discovered that this information was false as roads and other
        infrastructure still have not been completed.

267.    On August 6, 2007, Matt emailed McCleery regarding a conversation he
        had with a representative of Wells Fargo.

268.    The representative from Wells Fargo had informed Matt that Clarkson was
        setting up one of the loans as a second home and the other as an investment
        property.

269.    Matt was concerned about this and wanted to make sure all of the
        information was being provided correctly as both lots were investment properties.

270.    McCleery never responded to this email.

271.    Matt also sent a series of emails to Clarkson from August 31, 2007 to
        October 5, 2007, attempting to get confirmation that the loan on lot 42B had been
        set up properly as an investment.

272.    Matt never received direct confirmation from Clarkson that the loan was
        set up properly as an investment, but was informed by Jenna Fullerton of Wells
        Fargo that there was a 1-4 family rider attached to the loan which clearly
        indicated that it was not owner occupied, but an investment property.

273.    This information from Wells Fargo satisfied Matt that the loans had been
        set up properly.

274.    At the end of August 2007, the Rippertons moved towards closing for
        financing of the construction on the project.

275.    The closing on the permanent financing was to be contingent on the

Rippertons being able to sell a home they were building in Lehi, Utah.

276.    For closing one of the construction loans, Clarkson instructed Matt that he

would simply need to obtain a letter from a realtor that the home would sell

within 75 to 90 days.

277.    McCleery provided Matt with a realtor who drafted the letter and they

proceeded forward with the closing.

278.    During this same period of time, on August 22, 2007, WSS sent a draw

sheet to Wells Fargo, which was then forwarded to Clarkson, and then on to Matt

for his signature.

279.    Matt signed the draw sheet and returned it believing it was necessary to

move the project forward.

280.    On August 29, 2007, Clarkson forwarded the HUD forms for closing.

281.    The next day McCleery sent a copy of the contract with MIP.

282.    The Rippertons signed the closing documents on August 31, 2007 at

Charger Title with the assistance of Leslie Peterson, but did not sign the contract

with MIP at this time.

283.    The Rippertons did not provide any money at the time of closing and were

informed that none was required.

284.    This information was provided by Clarkson, McCleery and Peterson of

Charger Title.

285.    At this same time, the Rippertons agreed with McCleery that MIP would

return $3,000.00 of the deposit and pay the $10,000.00 partnership fee, but would

retain $3,000.00 to reserve a third unit which the Rippertons hoped to do in the near future.

286.     On September 4, 2007, McCleery emailed Matt informing him that she had invoiced the builder and he should be receiving his payments in the near future.

287.     At this same time Matt returned permit applications to the builder so the project could move forward.

288.     On September 12, 2007, Matt received instructions from WSS that any payment coupons from the bank needed to be sent to them so that WSS could make any payments which were required.

289.     McCleery confirmed this information in an email sent the same day.

290.     On October 4, 2007, MIP sent a check to the Rippertons for $7,000.00.

291.     This check was to cover the $10,000.00 partnership agreement payment, the $3,000.00 reservation fee, but had deducted $6,000.00 for an MIP class.

292.     The Rippertons were not pleased about being charged the $6,000.00 for the MIP class as the class never provided the services which had been promised.

293.     On October 5, 2007, Matt began sending information to Clarkson to qualify for financing on the third unit.

294.     On October 23, 2007, Matt emailed WSS to inform them that one of the loan payments was past due.

295.     WSS responded and said that the payment was in the process of being made.

296.     On November 4, 2007, Clarkson and McCleery both sent requests to Matt that payment coupons from Wells Fargo be sent directly to WSS.

297.     The Rippertons refused to do this because they wanted to be able to personally verify that payments were being made on time and committed to forwarding the coupons on to WSS as soon as they received them from the bank.

298.     On November 29, 2007, Matt discovered that he had not received a payment coupon from Wells Fargo and contacted the bank.

299.     Matt was informed by the bank that the coupon had been sent directly to WSS and that they were making payments directly.

300.     Matt was concerned about not being able to personally verify payments were being made and requested that WSS send proof of payment directly to him.

301.     On December 6, 2007, Matt emailed McCleery questions on the contract with MIP.  After receiving a response to his questions, Matt sent the signed contract to MIP on December 7, 2007.

302.     On December 19, 2007, Matt sent notification to WSS that loan payments on lot 42A were three months in arrears.

303.     It was later discovered that the payment coupons were sent by Wells Fargo to the construction site.

304.     WSS responded that they would make the payments that day.

305.     At the beginning of January 2008, Matt sent two separate emails to McCleery expressing his concerns with this and other MIP projects and the way MIP mortgage brokers working on MIP projects were working with the banks.

306.     Matt's concerns went largely unaddressed.

307.     On January 15, 2008, Clarkson sent draw requests to Matt for $42,715.00 per unit.

308.     Matt was confused why the draw requests were being sent by his mortgage broker, but believing that in order to move the project forward they needed to be signed, Matt signed and promptly returned them.

309.     It was later discovered that there were mistakes in the amounts requested on the draw forms.  These were corrected by Karen Morris of WSS to add additional funds for completion of the garages attached to the units.

310.     Matt signed the corrected forms on January 21, 2008 for $51,890.00 per unit.

311.     On February 6, 2008, Matt received an email from Malcolm Smith (at Wells Fargo) inquiring about a discrepancy in the amounts requested (higher amounts had been written on the draw sheets after Matt had approved the original numbers).

312.     Matt asked for an explanation from WSS.

313.     WSS and McCleery both responded that Wells Fargo required that the numbers match the original cost breakdowns and this is why the numbers were changed.  Matt signed the modified draw sheets in the amount of $66,148.00 per unit and returned them believing it was necessary to move the project forward.

314.     On April 3, 2008, Clarkson began asking questions about getting the permanent financing in place, and McCleery sent an email explaining that the

financing would only be necessary until the units sold and that closing costs and all mortgage payments would be made for the Rippertons.

315.     On April 10, 2008, Matt signed draw requests for $62,862.00 per unit.

316.     On April 28, 2008, Matt received an update from WSS with several pictures of his lot.

317.     The pictures made it appear that stone and stucco were going up on his duplex.

318.     At about this time Matt was also informed of the switch from WSS to Tri Global and on May 2, 2008, Matt returned replacement contracts substituting Tri Global in place of WSS.

319.     On May 2, 2008, Matt also signed draw forms for $20,277.00 per unit.

320.     On May 30, 2008, Matt received an update from the builder on his lot with pictures that make it appear the exterior was complete on the duplex.

321.     On June 2, 2008, Matt questioned discrepancies which were showing on the latest round of draw forms.

322.     One form stated that the draws were for stone, and the other said the draws were for a concrete slab and lumber.

323.     Tri Global responded that there were no longer modular units and the Wells Fargo branch dealing with side A had not adjusted the amount for stick building.[6]  Tri Global informed Matt that the bottom line would not change and that the true work completed was reflected in Tri Global's invoices.

---

[6] Stick building is a term of art describing that the duplex was custom built on site and that pre-fabricated pieces were not used in the construction.

324.     On July 16, 2008, Matt sent an email to Tri Global asking about late payments and delays in construction.

325.     Tri Global responded that it had not received statements; however, records indicate that the statements were sent to Tri Global's office in Denver.

326.     Drake of Tri Global also responded that the delay in construction was a result of stick building the units and that the units were much closer to completion than represented by Snyder.

327.     Based on these representations, Matt returned draw forms for $10,151.00 per unit.

328.     On August 15, 2008, Matt received an update from Tri Global with a picture of a kitchen fully installed (minus appliances) in one of the units.

329.     On September 4, 2008, Matt received an email from McCleery explaining that an investor was interested in buying all of the Branson units.

330.     On September 9, 2008, Matt signed and returned draw forms for $15,214.00 per unit.

331.     On September 10, 2008, Matt inquired about lien notices he had been receiving on the property and Tri Global responded that they were working on those issues.

332.     In order to facilitate the purchase of the project from the outside investor, Matt requested payoff amounts from Wells Fargo.

333.     On or about September 29, 2008, Wells Fargo informed Matt that the payoff amount for lot 42B was $387,355.00 and that lot 42B was approximately

$328,194.00.

334.    Also on September 29, 2008, Tri Global requested that signed draw forms be returned to obtain additional funds, but Matt did not send them in as Tri Global was behind on loan payments.

335.    Tri Global also requested that Matt sign loan extension documents for lot 42B as construction was not going to be complete by the end of the loan term.

336.    On October 13, 2008, Matt contacted McCleery and asked what he should do with recent draw requests.  Matt faced a conundrum as Tri Global was requesting additional draws, but the investor seeking to buy the project had informed Matt not to make any additional draws unless a mechanism to control the funds was put in place and run through a title company.

337.    Matt was in a difficult position as the loan extension agreement would reduce the amount of the loan from $441,000.00 to $391,000.00 and $387,000.00 had already been drawn.

338.    Matt also was in a position where he had to extend the loan, or Wells Fargo would call the entire amount due.  However, if Matt extended this would trigger release of funds and would violate the potential buyer's instructions to run any additional expenditures through a title company.

339.    Based on McCleery's instructions, Matt returned the extension agreement to Wells Fargo which reduced the loan amount available from $441,000.00 to $391,000.00 which also extended the term to January 23, 2009.

340.    On October 16, 2008, Matt received explicit instructions from McCleery

to not sign any more draws until fund control was set up through a title company.

341.      On October 17, 2008, Matt received a letter from Snider and Drake of Tri Global stating that all interest payments through October were current and that all funds requests were endorsed by a title company after Wells Fargo inspections.

342.      The potential investor continued negotiations for purchase of the project, but nothing resulted from them and the potential buyer completely backed out of the project.

343.      On December 1, 2008, Matt received a letter from Wells Fargo informing Matt that the loan on lot 42B was in default and needed to be cured by January 1, 2009.

344.      On December 31, 2008, Matt received another letter from Wells Fargo saying that the loan on lot 42A was in default and that they would accelerate the loan if the amount due was not paid by January 30, 2009.

345.      On January 13, 2009, Matt received notice of default on the lot 42A loan.

346.      On January 21, 2009, Matt received a letter from Wells Fargo stating that he needed to tender full payment of the loan on lot 42B or collection and foreclosure proceedings would be initiated.

347.      On January 27, 2009, Matt received a letter from Tri Global giving reasons for the delay in the infrastructure.

348.      To date, Matt owes obligations to Wells Fargo in excess of $715,000.00 and only has two unfinished duplex units that do not have completed roads or access to completed utilities and are encumbered by several liens.

**Stephen and Althea Hadlock**

349.     The Hadlocks' experience with MIP, WSS and Tri Global followed the same basic pattern as the above listed plaintiffs.

350.     The Hadlocks first learned of MIP while attending meetings put on by the Utah Creative Real Estate Association in early 2006.

351.     The Hadlocks engaged in multiple conversations and emails with McCleery about the different opportunities being presented by MIP.

352.     The Hadlocks were seeking to avoid risk and were willing to accept lower returns as long as they were not at risk to lose money.

353.     Based on this information, McCleery recommended that they select the credit partner option being provided by MIP.

354.     McCleery explained that they would not be required to put any money in and would receive $5,000.00 per unit they financed with MIP.

355.     The Hadlocks received an email and printout from MIP and McCleery completely outlining the credit partner option on March 30, 2006.

356.     The Hadlocks first learned of the Branson project in or about July 2006.

357.     The Hadlocks still had reservations about the project and did not initially become involved.

358.     The Hadlocks continued to attend MIP meetings and were informed at a meeting held on February 28, 2007 that additional opening were available in the Branson project.

359.     In this meeting MIP, specifically McCleery, pushed the Branson project as

an extremely safe investment. The Hadlocks specifically asked in this meeting, and on several other occasions, what their risk was. They were repeatedly told that the only real risk was if both McCleery and Burton were to die at the same time, but even if that happened they would still have a valuable piece of property.

360.     Based on these representations, the Hadlocks decided to move on the Branson project and on March 6 and 7, 2007, sent emails to McCleery expressing their interest and also verifying their payment of a $3,000.00 reservation fee.

361.     On March 8, 2007, the Hadlocks received an email from McCleery asking them to fill out the attached 1003 real estate documents, sign and initial them, and return for MIP's records.

362.     The Hadlocks began receiving the same emails made reference to in the above sections regarding financing from McCleery and Clarkson.

363.     McCleery and Clarkson both informed the Hadlocks that Clarkson would be dealing directly with the banks and other financial institutions.

364.     On April 30, 2007, the Hadlocks received an email from McCleery stating that paperwork would be sent the next day to close on the Branson property and that the Hadlocks needed to sign the RESPA documents. This closing never went through as promised.

365.     On July 30, 2007, the Hadlocks received an email from MIP stating that four more Branson lots had closed with Wells Fargo, that land improvements were moving forward on all lots as if they had all closed, that the roads were almost complete and that foundations would start going in soon.

366.     This email led the Hadlocks to believe that the project was moving

forward and that the delays they were experiencing with their closing would not

affect the project at all.  Based on this information the Hadlocks continued

working with Clarkson to secure financing on the project.

367.     The Hadlocks provided all requested information to Clarkson and after

going through several financial institutions finally obtained assurances that

Lawrence Bank would provide financing for the deal.

368.     Several of the forms sent to the Hadlocks by Clarkson contained incorrect

information; specifically that the unit was to be owner occupied.

369.     The Hadlocks corrected this on every application they received and

repeatedly informed Clarkson that the property was strictly an investment

property and would not be owner occupied.

370.     The Hadlocks attempted to stay in constant communication with

McCleery during this process and sent her several emails with questions regarding

the project.

371.     On August 30, 2007, the Hadlocks received an email from McCleery

responding to questions the Hadlocks had posed regarding the risk on the project

and specifically with payments made on the financing.

372.     In this email McCleery explained that the monthly payments on the

financing came directly from MIP, but that the cash was secured by the property.

McCleery went on to explain that there was little risk of losing the principal.  She

explained that if the company (MIP) did go down, or if she died, the monthly

payments could stop, but there was no need to worry because MIP kept six months reserve payments for each property.

373.    On information and belief, the representation that MIP kept six months reserve payments for each property was false.

374.    On September 10, 2007, the Hadlocks received an email from MIP showing progress on the development of the project and stated that the roads were taking shape and foundations would be going in soon.

375.    On October 4, 2007, the Hadlocks received an email from McCleery which she had forwarded on from Clarkson. The email explained that the construction loan would be financed by Lawrence Bank and permanent financing would be set up through Wells Fargo. The email also contained a list of the items Clarkson would need to provide to Lawrence Bank.

376.    On October 10, 2007, the Hadlocks received a credit authorization form for Lawrence Bank which needed to be signed and returned to Clarkson.

377.    On October 12, 2007, the Hadlocks received an email from McCleery with a blank financial statement attached. McCleery requested the Hadlocks fill out the financial statement and return it to Clarkson for Lawrence Bank.

378.    On November 9, 2007, the Hadlocks received an email from Clarkson explaining that the closing should happen by Thanksgiving.

379.    On December 5, 2007, the Hadlocks closed on the loan with Lawrence Bank for lot 11A.

380.    The closing was accomplished through Great Lakes Title & Escrow

Company and Kip Hurley.

381.     The Hadlocks verified that they would not be required to provide any

money at closing and that MIP or WSS would cover all payments due on the loan.

382.     Hurley assured them that no money was required at the closing and

McCleery assured them that per the terms of the agreement MIP or WSS would

pay all costs associated with the loans.

383.     Shortly thereafter, on or about December 19, 2007, the Hadlocks received

a check for $6,500.00 which covered the $5,000.00 payment and a refund of their

$1,500.00 reservation fee[7].

384.     Approximately one week after closing on the loan Althea received a phone

call from Clarkson.

385.     During the phone conversation Clarkson asked Althea to fax him a check

for $98,000.00.

386.     Clarkson explained that the check would not be cashed, but that Lawrence

Bank had changed its requirements on the loan and the check had become

necessary.

387.     Althea was confused as to how the terms could change after the loan had

already closed, but Clarkson told her that if she did not send him the check that

she would immediately be responsible for all the costs of the loan which were

approximately $17,000.00.

388.     Althea said that she thought it was dishonest to change the terms of the

---

[7] MIP typically charged a reservation fee of $3,000.00 per unit, however in the Hadlocks' case they were only required to pay a reservation fee of $1,500.

agreement and Clarkson said that it was, but it was her only choice.

389.     Clarkson told Althea that she needed to send the check immediately and

back date it to December 3, 2007.

390.     Althea was so distraught over the information Clarkson was giving her

that she did not realize that back dating the check to December 3, 2007, placed the

date of the check before closing.

391.     Althea was also so distraught that she did not even think to speak with her

husband about this as he was at work and not available during the phone call.

392.     Althea decided that she had no choice but to send the check and trusted

that Clarkson was looking out for her best interests.

393.     In October 2008, the Hadlocks received notice from Lawrence Bank that

the interest payments due on the loan were not being paid.

394.     In order to protect their credit, the Hadlocks began making the interest

payments, and to date have paid $9,268.37, which pursuant to the agreement with

MIP were required to be made by MIP.

395.     The Hadlocks also were forced to pay property taxes, which per the terms

of the contract were to be paid by MIP.

396.     McCleery also informed the Hadlocks in an email dated January 28, 2008,

that the interest payments and property taxes would be paid by WSS/ Tri Global.

397.     The Hadlocks contacted Lawrence Bank and requested information as to

what they should do to rectify the problems which were occurring with the loan.

398.     Lawrence Bank requested that the Hadlocks obtain a break down on what

work had been performed on the property and an itemized list of how the

disbursements had been used.

399.    The Hadlocks immediately made this request to Drake at Tri Global and

Drake assured them that he would provide this information to them and also

forward the information on to David Clark at Lawrence Bank.

400.    After the Hadlocks made repeated attempt to obtain the information from

Drake without success, Drake informed the Hadlocks they would have to get the

information from his attorney Mr. Charles Liken.

401.    The Hadlocks contacted Mr. Liken and made these requests as well.

402.    Liken informed them that Drake was in the process of providing this

information and they would have them in the near future.

403.    The dates passed when Drake had promised to provide the information

without any results.

404.    The Hadlocks contacted Liken asking for the information and Liken

expressed his frustration with the fact that Drake still had not provided the

information to him.

405.    Drake has ceased receiving phone calls from the Hadlocks and has not

returned any of their messages.

406.    To date, the Hadlocks owe $231,075.48 and as compensation have only

received an unfinished lot, with no structure, and with multiple liens.

**Stephen and Suzanne Oathout**

407.    The Oathouts became involved in the Branson project with Tri Global in

2006.

408.     Before investing, David Drake and Don Snyder explained that the

Oathouts' investment would be as a "credit partner" only.

409.     They further informed the Oathouts that they would cover all costs

associated with the loans obtained through the Oathouts' credit.

410.     These costs included the following:

   a.  Down payment

   b.  Closing costs

   c.  Loan fees

   d.  Monthly loan payments to Columbian Bank

411.     On March 6, 2006, the Oathouts signed the first property venture

agreement.

412.     The agreement stated that all loan interest would be paid through proceeds

from the project rather than the Oathouts.

413.     It further stated that the Oathouts were to receive $22,500 for 5 units as a

result of the transaction.

414.     Drake set the Oathouts up with Bret Clarkson to broker the loans for the

Branson project. They were informed that all loan arrangements with the banks

would be handled through Clarkson.

415.     On September 6, 2006, the Oathouts completed a handwritten uniform

residential loan application which was sent via fax to Clarkson.

416.     The application stated Steven's monthly income at $2,200.

417.     On October 25, 2006 the Oathouts received a typed uniform residential

loan application filled out by Clarkson based on the handwritten application he

received September 6, 2006.

418.     The Oathouts combined monthly income was overstated on the typed

application. Suzanne crossed out the incorrect amounts and replaced them with

the correct combined monthly income of $14,400.

419.     The Oathouts did not authorize and were unaware that the false or inflated

monthly income figure had been submitted to Columbian Bank.

420.     On October 30, 2006, the Oathouts re-signed the loan application

documents and then mailed them back to Clarkson.

421.     The Oathouts believed they had already corrected Mr. Oathout's income

and did not check and make sure the stated income for Mr. Oathout was correct.

422.     On November 11, 2006, the Oathouts submitted a personal financial

statement to Columbian Bank clearly disclosing their annual income of $150,000.

423.     On December 28, 2006, the Oathouts signed the loan commitment form

from Columbian Bank.

424.     On January 8, 2007, the Oathouts closed on four loans with Columbian

Bank.

425.     Each loan was for a total loan value of $338,000.

426.     Tri Global has drawn $255, 538 on each of the four loans.

427.     The Oathouts were told to forward any interest payments coupons for the

loans to MIP, which they did.

428.     After forwarding the coupons, the Oathouts received at least two past due notices. The Oathouts forwarded these to Drake and then did not receive further late notices.

429.     On the same date of January 8, 2007, the Oathouts signed the construction Lien Indemnity agreement with Hogan Land Title.

430.     The Oathouts received the trust deeds for all four loans by mail from either Clarkson or Drake. At no time did Clarkson or Drake direct the Oathouts to go to any sort of title agency office or any other type of office.

431.     After signing the trust deeds the Oathouts mailed them to Drake's office.

432.     Also on January 8, 2007, the Oathouts signed a second property venture agreement to replace the first agreement.

433.     The new agreement detailed that the Oathouts would receive $20,000 per duplex. $10,000 upon the closing of the loan documents and $10,000 upon completion of construction.

434.     The Oathouts received a check for $10,000 for each duplex they financed, for a total of $20,000.

435.     On January 28, 2007, the Oathouts received an email regarding the first draw request for each lot from Columbian Bank.

436.     The draws were to cover the 40% Home Deposit of $51,930.00 and $30,999.20 for water/sewer hook-up, building permit, foundation, staking, ILC and project management fees, for a total of $82,929.20 for each of the properties.

437.     It was later discovered that much of the construction work which had been

represented by MIP and WSS/Tri Global to have been completed had not been and the construction distributions which had been issued by Columbian Bank had not gone towards the construction of the project as represented.

438.      On April, 29, 2007, the Oathouts signed "Seller's Agency Listing Contract, (Exclusive Right to Sell)" in favor of Indian Ridge Real Estate Group Inc.

439.      On September 7, 2007 the Oathouts signed the Stone County Residential Building Permit Application for all the lots.

440.      On December 20, 2007, the Oathouts submitted another Personal Financial Statement to Lawrence Bank, clearly stating their annual income as $92,000.

441.      In March 2008, the Oathouts received a general newsletter stating that the first structures in the project were going up. The newsletter did not state anything specific in regards to the Oathouts' lots.

442.      The Oathouts never received any information specific to their lots.

443.      Suzanne does not recall receiveing written notice of Wss's change to Tri Global. She was verbally informed by Drake of the coming change and then noticed the change in the company's name on the documents she received.

444.      On May 2, 2008, the Oathouts signed a sales contract for new construction for each of the lots outlining the terms of the agreement with the builder, Tri Global Development, to replace the contracts with WSS.

445.      On August 25, 2008, the Oathouts received notice from the FDIC that

Columbian Bank had been closed by the Office of the State Bank Commissioner

of Kansas and that the FDIC had been appointed as receiver of that bank.

446.　　In September 2008 the Oathouts received "Certified Notice of Intention to

File Mechanic's Lien on behalf of Jimmy Jones Excavation, Inc."

447.　　During this time Suzanne was informed by Drake that McCleery was

resigning from her position with MIP.

448.　　On September 8, 2008, the FDIC, through Patricia Basset, notified the

Oathouts that they were past due on their loans.

449.　　Suzanne had been informed that WSS/Tri Global had paid in full all

obligations on the four loans.

450.　　After the FDIC took control of Columbian Bank all construction draws

were stopped and the loan accounts were frozen. As a result, on September 17,

2008, the Oathouts received an email from Drake of Tri Global explaining that

because there were no more construction distributions, Tri Global would no

longer be making the interest payments on the loans as originally promised.

451.　　In this same email, Drake attempted to blame the FDIC for the failures of

the Branson project and stated that "Everyone should be angry at the way the

FDIC is handling this" and went on to say that "it is wrong to shut down

construction loans off midstream."

452.　　In order to remedy the situation which had been created by MIP and

WSS/Tri Global's failure to make the interest payments as promised and finish

the project, the Oathouts began negotiating with a possible third party to purchase

the project.

453.    However, nothing resulted from these negotiations and the Oathouts were
left with loan obligations of slightly more than $255,500 per unit on four units
and the accompanying interest payments.

454.    On November 24, 2008, the Oathouts received a Formal and Final
Demand from the FDIC calling the four loans previously held by Columbian
Bank due. The amount owing on the first loan was $255,537.72; the amount
owing on the second loan was $255,535.35; the amount owing on the third loan
was $255,535.34; and the amount owing on the fourth loan was $255,537.72.

455.    The same letter informed the Oathouts that the FDIC would no longer be
funding any further commitments.

456.    On December 17, 2008, the Oathouts received a letter from Drake and
Snider informing them of their option to work with Home Mortgage Resources,
Inc. (HMR Inc.) to "recast [their] notes, finish construction to the point of
certificate of occupancy and write permanent mortgages to those borrowers who
both qualify and have the desire to own a unit."

457.    On December 22, 2008, the Oathouts signed a "Consent for Release of
Confidential Information" for disclosure to HMR Inc."

458.    On April 30, 2009, the Oathouts received certified mail from the FDIC
informing them that their loan had matured and was now due and payable in full.
It further informed them they had ninety (90) days from receipt of the letter to
assert any claims or the claims would be barred.

459.     On May 14, 2009, Suzanne made a formal written FDIC statement to

Jonathan Heydon. Heydon informed Suzanne that no work had been done to any

of her four lots.

460.     On May 17, 2009, the Oathouts were served with a Complaint by Jimmy

Jones Excavation.

461.     As a result of entering into the agreement with MIP which was to provide

them $20,000 ($10,000 for each duplex) for allowing MIP to use their credit, the

Oathouts have loans being called due which total 1,022,146.13, and four empty

lots which are encumbered with several liens.

## THEORY OF LIABILITY
### (Civil Conspiracy against all Defendants)

462.     Plaintiffs hereby incorporate and re-allege all previous paragraphs of this

Complaint as though fully set forth herein.

463.     Defendants MIP, WSS/Tri-Global, Liz McCleery, David Burton, Brent

Clarkson, David Drake, and Don Snider, participated in a civil conspiracy. The

object of this conspiracy was to induce investors into obtaining construction

loans, depleting said loans, and leaving the investors with undeveloped property

and the debt associated with that property.

464.     Defendants MIP, WSS/Tri-Global, Liz McCleery, David Burton, Brent

Clarkson, David Drake, and Don Snider, each played a different role in this

conspiracy. Defendants MIP, Liz McCleery, and David Burton would entice

investors into obtaining construction loans to construct property on lots located in

Branson, MO.

465.     Defendants MIP, WSS/Tri-Global, Liz McCleery, and David Burton represented to Plaintiffs that investing in the Branson, MO project would be a low risk high reward investment.

466.     Each investor MIP, Liz McCleery and David Burton brought in would be turned over to Brent Clarkson.  Defendant Clarkson would ensure that the construction loan applications would be accepted by the banks.  Often this involved changing investors' answers on the completed forms.  *See eg.* Stephen and Suzanne Oathout above.

467.     After bank approval of the construction loan, WSS/Tri-Global, Don Snider, and David Drake would make draws on the construction loans under the guise of building duplexes.  Despite WSS/Tri-Global, Don Snider, and David Drake making significant draws, few if any improvements were actually built on Plaintiffs' lots.

468.     While WSS/Tri-Global, Don Snider, and David Drake were making draws for construction they did not perform, they were also sending newsletters to Plaintiffs assuring them that construction was progressing smoothly.  These representations were entirely false as little or no work had actually been performed on Plaintiffs' properties.  Defendants WSS/Tri-Global, Don Snider, and David Drake used these newsletters to reassure Plaintiffs and allow WSS/Tri-Global, Don Snider, and David Drake time to draw down the construction loans.

469.     All of the representations made to Plaintiffs during the enlistment, loan application, and loan draw down stages of the conspiracy were made with the full

knowledge of each Defendant.

470.     The Defendants all engaged in an agreement to convey this information to

Plaintiffs with the intent and for the purpose of obtaining construction loan funds

obtained through Plaintiffs' credit.

471.     The information Defendants conveyed to Plaintiffs to obtain the loan

funds was misleading.  Specifically Defendants promised that the investments

were safe, Defendants promised that WSS/Tri-Global, David Drake, and Don

Snider would pay all interest payments on the construction loans, Defendants

made several promises that construction was progressing smoothly, Defendants

also made several promises that Plaintiffs' investments were secure.

472.     At the time Defendants made these representations to Plaintiffs,

Defendants knew or should have known that they would not fulfill their promises

to Plaintiffs.

473.     The Defendants all understood and agreed upon their roles prior to

engaging in their conspiracy to obtain the construction loan funds through

Plaintiffs' credit.  Specifically, Defendants formed a collaboration through which,

MIP, Liz McCleery, and David Burton would collect investors, Brent Clarkson

would prepare their loan applications, and WSS/Tri-Global, David Drake, and

Don Snider would collect draws on the funds.

474.     Upon information and belief, the purpose of this conspiracy was to raise

capital from unaccredited investors, which purpose is contrary to established State

and Federal Securities Regulation laws.

475.     Further, each Defendant was aware of the purpose and illegal capital raising methods employed by MIP, Liz McCleery, and David Burton, yet each Defendant knowingly participated in the scheme and upon information and belief each Defendant partook of the construction loan funds. Therefore, each Defendant was aware of, participated in, and benefitted from the illegal purposes of the collaboration.

476.     Defendants all made their statements and promises at times when they knew the statements were not true and thereby perpetrated a fraud. Defendants also failed to disclose material information relating to the investments and use of the investment funds.

477.     Defendants' fraudulent actions resulted in direct and proximate harm to Plaintiffs as Plaintiffs are now left owing large construction loans for lots which have received little or no improvements.

478.     Further, as co-conspirators each Defendant is jointly and severally liable for the harms caused by the conspiracy.

479.     This fraudulent activity and the agreement between all of the Defendants satisfies the requirements for a civil conspiracy and therefore makes all of the Defendants co-equal for liability purposes on all causes of action alleged in this Complaint.

## **THEORY OF LIABILITY**
### **(Respondeat Superior as to WSS/Tri-Global, David Drake, and Don Snider)**

480.     Plaintiffs hereby incorporate and re-allege all previous paragraphs of this Complaint as though fully set forth herein.

481.    Upon information and belief, Defendants MIP, Liz McCleery, David

Burton, and Brent Clarkson acted as agents of Defendants WSS/Tri-Global, David

Drake, and Don Snider.

482.    Under the direction of WSS/Tri-Global, David Drake, and Don Snider,

Defendants MIP, Liz McCleery, and David Burton solicited investors to apply for

and obtain construction loans.  Such loans were ostensibly obtained for the

purposes of constructing duplexes in Branson, MO.

483.    Defendants WSS/Tri-Global, David Drake, and Don Snider initiated the

project and enlisted MIP, Liz McCleery, and David Burton to obtain construction

loan investors for the project.

484.    Defendants WSS/Tri-Global, David Drake, and Don Snider were aware of

all representations made to investors to entice them to obtain construction loans.

485.    Defendants WSS/Tri-Global, David Drake, and Don Snider enlisted Brent

Clarkson to prepare Plaintiffs' construction loan applications.

486.    Defendants WSS/Tri-Global, David Drake, and Don Snider were aware

that Defendant Brent Clarkson intentionally misstated facts on Plaintiffs'

construction loan applications.

487.    Under respondeat superior, Defendants WSS/Tri-Global, David Drake,

and Don Snider are all equally liable for the actions of Defendants Brent

Clarkson, MIP, Liz McCleery, and David Burton.

### **FIRST CAUSE OF ACTION**
**(Breach of Contract against MIP)**

488.    Plaintiffs hereby incorporate and re-allege all preceding paragraphs of this

Complaint as though fully set forth herein.

489.     Plaintiffs entered into a valid and enforceable contract with MIP whereby Plaintiffs would allow MIP to use their credit in order to finance lots in the Branson project.

490.     As part of the agreement, Plaintiffs were required to apply their best efforts to receive financing on the Branson project through banking or other financial institutions.

491.     Plaintiffs conformed to the requests placed upon them and did in fact secure financing for the project.

492.     As part of the agreement, MIP was required to pay $5,000.00 per unit financed and also to make all payments on the obtained financing.

493.     MIP has breached the terms of the contract by failing to make the mandatory payments on the financing.

494.     As a result of MIP's breach, Plaintiffs have been harmed in an amount to be proven at trial, but in an amount no less than the missed payments, the penalties assessed by the banks for the late payments, and the total amount due to the banks to close out the financing, plus a compensatory amount for the damage done to Plaintiffs' credit due to MIP's breach.

**(Breach of Contract Against WSS/ Tri Global)**

495.     Plaintiffs hereby incorporate and re-allege all preceding paragraphs of this Complaint as though fully set forth herein.

496.     Plaintiffs entered into valid and enforceable contracts with WSS for the

construction of duplexes in the Branson project.

497.    The duties and obligations contained in the contracts between Plaintiffs
and WSS were transferred to Tri Global.

498.    Plaintiffs have conformed to all duties and requirements placed upon them
by the contract with WSS/ Tri Global.

499.    WSS/ Tri Global has breached the terms of the agreement by failing to
construct the duplex units as promised in the contract.

500.    To whit, WSS/ Tri Global has made disbursement requests and accepted
those requests which are far in excess of any work which has been performed on
the property.

501.    As a direct result of WSS/ Tri Global's breaches of the agreement,
Plaintiffs have been damaged in an amount to be proven at trial, but not less than
the missed payments, the penalties assessed by the banks for the late payments,
and the total amount due to the banks to close out the financing, plus a
compensatory amount for the damage done to Plaintiffs' credit due to WSS/ Tri
Global's breach.

## SECOND CAUSE OF ACTION
### (Breach of Implied Covenant of Good Faith and Fair Dealing Against MIP)

502.    Plaintiffs hereby incorporate and re-allege all preceding paragraphs of this
Complaint as though fully set forth herein.

503.    Pursuant to Utah law, each and every contract entered into in the State of
Utah carries with it an implied covenant of good faith and fair dealing.

504.    The implied covenant of good faith and fair dealing imposes a burden

upon the contracting parties to act in such a way as to insure the other parties receive the fruits of the contract.

505.     Defendant MIP has failed to act in good faith and in a fair manner by refusing to make the payments on the loan obligations incurred by Plaintiffs.

506.     Defendant MIP's actions have resulted in Plaintiffs being deprived of the fruits of the contract and have also caused great detriment to Plaintiffs.

507.     As a result of Defendant MIP's breach of the implied covenant of good faith and fair dealing, Plaintiffs have been harmed in an amount to be proven at trial but no less than an amount which includes the missed payments, the penalties assessed by the banks for the late payments, and the total amount due to the banks to close out the financing, plus a compensatory amount for the damage done to Plaintiffs' credit due to MIP's breach.

**(Breach of Implied Covenant of Good Faith and Fair Dealing
Against WSS/ Tri Gobal)**

508.     Plaintiffs hereby incorporate and re-allege all preceding paragraphs of this Complaint as though fully set forth herein.

509.     Pursuant to Utah law, each and every contract entered into in the State of Utah carries with it an implied covenant of good faith and fair dealing.

510.     The implied covenant of good faith and fair dealing imposes a burden upon the contracting parties to act in such a way as to insure the other parties receive the fruits of the contract.

511.     Defendant WSS/ Tri Global breached the implied covenant of good faith and fair dealing by making draws on the construction financing in excess of the

Complaint
Page 66 of 87

Case 2:09-cv-00254-DB   Document 33-2   Filed 08/17/2009   Page 67 of 87

amount of work which was actually being completed on the project.

512.     Defendant WSS/ Tri Global's breach has resulted in a deprivation of the

fruits of the contract by Plaintiffs.

513.     As a result of WSS/ Tri Global's breach, Plaintiffs have been harmed in an

amount to be proven at trial, but not less than an amount which includes the

missed payments, the penalties assessed by the banks for the late payments, and

the total amount due to the banks to close out the financing, plus a compensatory

amount for the damage done to Plaintiffs' credit due to WSS/ Tri Global's breach.

### THIRD CAUSE OF ACTION
### (Fraudulent Inducement)

514.     Plaintiffs hereby incorporate and re-allege all preceding paragraphs of this

Complaint as though fully set forth herein.

515.     Defendants MIP and WSS/ Tri Global made fraudulent statements to

Plaintiffs in order to induce them into entering into the contracts listed above.

516.     The fraudulent statements made by MIP and WSS/ Tri Global consist of,

but are not limited to, that the Branson project was an extremely low risk

investment opportunity, and that the duplex units could be built in a three to four

month period of time.

517.     These statements were made by McCleery, Burton, Drake and Snider in

meetings held on the above listed dates and in multiple emails sent by these

individuals as described in the general allegations section of this Complaint.

518.     These statements were material as they directly related to whether or not

the investment opportunity would provide the types of benefits sought after by

potential investors.

519.     These representations were made by McCleery, Burton, Drake and Snider at a time when they knew these representation were false, or at a minimum these representations were made in a reckless and irresponsible manner.

520.     These false statements were knowingly made as individuals experienced in the construction and real estate industry knew, or should have known, that it was not feasible to complete this type of construction on such a large project within three to four months, or that such an investment was high risk taking into account the volatility of the real estate market.

521.     McCleery, Burton, Drake, and Snider all made these representations for the purpose of inducing Plaintiffs to rely on said representations so that the Defendants could profit from Plaintiffs' investments.

522.     The Plaintiffs reasonably relied upon these representations in determining whether or not to enter into the contracts listed above as McCleery, Burton, Drake, and Snider all held themselves out as individuals experienced in the construction and real estate industry.

523.     Plaintiffs' reliance on these representations resulted in Plaintiffs providing access to their credit to MIP and WSS/ Tri Global which resulted in monetary damage and damage to Plaintiffs' credit.

524.     This damage results in an amount to be proven at trial but not less than an amount which includes the missed payments, the interest payments made by Plaintiffs, the penalties assessed by the banks for the late payments, and the total

amount due to the banks to close out the financing, plus a compensatory amount for the damage done to Plaintiffs' credit due to Defendants' fraudulent inducement.

## FOURTH CAUSE OF ACTION
### (Fraudulent Misrepresentation)

525.     Plaintiffs hereby incorporate and re-allege all preceding paragraphs of this Complaint as though fully set forth herein.

526.     Defendants made the following fraudulent statements which resulted in direct harm to Plaintiffs:

a.   Defendants MIP, McCleery, Burton, WSS/ Tri Global, Drake and Snider made multiple representation to Plaintiffs in the form of emails and newsletters on the dates listed in the general allegations section of this Complaint which led Plaintiffs to believe that construction was progressing in accordance with the draws being made on the construction loans;

b.   Defendants MIP, McCleery and Clarkson made representations that the information contained in the contracts with MIP and WSS/ Tri Global did not need to be revealed to the banks providing financing for the project by Plaintiffs and that all arrangements with the banks would be made by Clarkson.  The representations were made in emails and letters on the dates outlined in the general allegations section of this Complaint;

c.   Defendants MIP, McCleery and Clarkson represented to Plaintiffs that the banks were fully aware of the payment structure and that the banks were

in complete accord with those arrangements. These representation were made in emails on the dates listed in the general allegations section of this Complaint;

    d.  Defendants MIP, McCleery, Clarkson, WSS/ Tri Global, Drake, and Snider represented to Plaintiffs that no money would be required at closing. These representations were made in emails on the dates listed in the general allegations section of this Complaint;

    e.  Defendants MIP, McCleery, Clarkson, WSS/ Tri Global, Drake and Snider all made representations that all obligations on the loans had been paid in full pursuant to the agreements entered into between Plaintiffs and Defendants. These representations were made in emails on the dates listed in the general allegations section of this Complaint.

527.    These statements were in fact false as was later discovered by the Plaintiffs.

528.    These representations were material as they directly related to the profitability and legitimacy of the investment.

529.    McCleery, Clarkson, WSS/Tri Global, Drake and Snider all knew, or should have known that the above listed representations were false as they were the individuals and entities in charge of supervising the construction and financing of the project.

530.    The Defendants made these statements to induce Plaintiffs to rely upon them so that Plaintiffs would invest their money with Defendants and continue to

permit withdrawals to be made on the construction financing.

531.     Plaintiffs did in fact rely on the statements made by Defendants in that they entered into the agreements and permitted Defendants to make withdrawals on the construction financing in order to continue with the construction of the project.

532.     Plaintiffs' reliance was reasonable as Defendants held themselves out as competent and experienced individuals in the construction, real estate and banking fields.

533.     Plaintiffs have been directly damaged by Defendants' fraudulent representations in an amount to be proven at trial, but not less than an amount which includes the missed payments, the interest payments made by Plaintiffs, the penalties assessed by the banks for the late payments, and the total amount due to the banks to close out the financing, plus a compensatory amount for the damage done to Plaintiffs' credit due to Defendants' fraudulent representations.

**FIFTH CAUSE OF ACTION**
**(Fraudulent Non-Disclosure)**

534.     Plaintiffs hereby incorporate and re-allege all preceding paragraphs of this Complaint as though fully set forth herein.

535.     Defendants failed to disclose the following material facts regarding the investment opportunity on the Branson project:

    a.   Defendants MIP and WSS/ Tri Global, and the individuals associated with these entities failed to disclose the full extent of the relationship between MIP and WSS/ Tri Global and any profits sharing which was taking place

between the companies;

b.  Defendants MIP, WSS/ Tri Global, Northshore Investments, and the
individuals associated with these entities failed to disclose the fact that
WSS/ Tri Global and Northshore Investments were owed and managed by
the same principals which resulted in the purchase price on the property
going to the same company which was to complete the construction on the
property;

c.  Defendants MIP, WSS/ Tri Global, and the individuals associated with
these companies failed to disclose to Plaintiffs that the loan disbursements
which were to be used for construction on the project were also used to
make the interest payments on the construction loans;

d.  Defendants MIP, WSS/ Tri Global, and the individuals associated with
these companies failed to disclose to Plaintiffs the amount of risk involved
in the project, specifically never providing them with a private placement
memorandum as required by securities law;

e.  Defendant MIP failed to disclose that it did not have the cash to make the
payments required pursuant to the credit partner agreements;

f.  Defendants MIP, WSS/ Tri Global, Northshore Investments, and the
individuals associated with these companies failed to disclose to Plaintiffs
the true value of the undeveloped lots in the Branson project.

536.    The Defendants in this case had a legal duty to disclose this information to
Plaintiffs as Defendants were holding themselves out as investment advisors.

537.     All of the above listed non-disclosures were material to the project as they directly relate to the profitability and legitimacy of the Branson project.

538.     All of the information listed above in the subsections of Paragraph 453 of this Complaint was known by Defendants prior to Plaintiffs entering into the agreements with Defendants.

539.     All of the Defendants were aware, or should have been aware, that the information not disclosed was material to the investment and should have been disclosed.

540.     Defendants failed to disclose the above listed information for the specific purpose of increasing the likelihood that Plaintiffs would choose to invest in the Branson project.

541.     Plaintiffs did in fact rely on the Defendants to fully disclose any information necessary to make the other representations made by Defendants not misleading.

542.     Plaintiffs have been directly damaged by Defendants' fraudulent non-disclosures in an amount to be proven at trial, but not less than an amount which includes the missed payments, the interest payments made by Plaintiffs, the penalties assessed by the banks for the late payments, and the total amount due to the banks to close out the financing, plus a compensatory amount for the damage done to Plaintiffs' credit due to Defendants' fraudulent representations.

### SIXTH CAUSE OF ACTION
**(Fraud against WSS/Tri-Global, David Drake, and Don Snider)**

543.     Plaintiffs hereby incorporate and re-allege all preceding paragraphs of this

Complaint as though fully set forth herein.

544.     Plaintiffs obtained construction loans with the understanding that

Defendants WSS/Tri-Global, David Drake, and Don Snider would use

construction loan funds for the construction of Duplexes in Branson, MO.

545.     Plaintiffs' understanding was based upon representations from WSS/Tri-

Global, David Drake, and Don Snider.

546.     In numerous emails and newsletters, Defendants WSS/Tri-Global, Drake,

and Snider assured Plaintiffs that they were constructing duplexes in Branson,

MO and that construction was proceeding rapidly.

547.     Defendants WSS/Tri-Global, Drake, and Snider made significant draws on

the construction loans obtained by Plaintiffs.

548.     Plaintiffs reasonably relied on the representations of WSS/Tri-Global,

Drake, and Snider in allowing these Defendants to make draws from the

construction loans.

549.     The representations of progress made by Defendants WSS/Tri-Global,

Drake, and Snider were fraudulent and significantly overstated the progress that

had been made on Plaintiffs' lots.

550.     Defendants' fraudulent representations allowed them to draw the majority

of the construction loan funds without completion of any significant improvement

on Plaintiffs' lots.

551.     Plaintiffs are now left with damaged credit, large amounts owing on

construction loans, and undervalued lots with few if any improvements.

552.   Plaintiffs have been directly damaged by Defendants' fraudulent conduct in an amount to be proven at trial, but not less than an amount which includes the missed payments, the interest payments made by Plaintiffs, the penalties assessed by the banks for the late payments, and the total amount due to the banks to close out the financing, a compensatory amount for the damage done to Plaintiffs' credit due to Defendants' fraudulent conduct.

**SEVENTH CAUSE OF ACTION**
**(Federal Securities Fraud)**

553.   Plaintiffs hereby incorporate and re-allege all preceding paragraphs of this Complaint as though fully set forth herein.

554.   As is more fully explained in Plaintiffs theories of liability, all Defendants are liable for Federal Securities Fraud under respondeat superior and civil conspiracy theories of liability.

555.   Pursuant to 15 USCA §77b(a) of the Securities Act of 1933, ("Securities Act") any certificate of interest, participation in a profit-sharing agreement, or investment contract is defined as a "security" subject to regulation by said act.

556.   Section 77q(a) of the Securities Act provides that:

It shall be unlawful for any person in the offer or sale of any securities…by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly;

    i.   to employ any device, scheme, or artifice to defraud, or
    ii.   to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
    iii.   to engage in any transaction, practice, or course of business

which operates or would operate as a fraud or deceit upon
the purchaser.

557.     The investments which the Plaintiffs entered into with the

Defendants constitute securities as defined by the Securities Act.

558.     Defendants MIP, McCleery, Burton, Clarkson, all violated Section 77q(a)

by making material misrepresentations as to timing of construction of the

investment properties, the amount of actual construction completed on the project,

the information which needed to be provided to the banks providing the funding

for the project, that no down payment was required at closing, and that all

obligations in the form of payments to the bank were made and current.

559.     The details and particulars of these misrepresentations are articulated in

the above sections which outline each investors' interaction with Defendants,

what representations were made, when those representations were made, and who

made those representations.

560.     Defendants also violated Section 77q(a)(ii) by failing to disclose the

following material facts regarding the investment opportunity on the Branson

project:

    a.     Defendants MIP and WSS/ Tri Global, and the individuals associated with

        these entities failed to disclose the full extent of the relationship between

        MIP and WSS/ Tri Global and any profits sharing which was taking place

        between the companies;

    b.     Defendants MIP, WSS/ Tri Global, Northshore Investments, and the

        individuals associated with these entities failed to disclose the fact that

WSS/ Tri Global and Northshore Investments were owned and managed by the same principles which resulted in the purchase price on the property going to the same company which was to complete the construction on the property;

c. Defendants MIP, WSS/ Tri Global, and the individuals associated with these companies failed to disclose to Plaintiffs that the loan disbursements which were to be used for construction on the project would also be used to make the interest payments on the construction loans;

d. Defendants MIP, WSS/ Tri Global, and the individuals associated with these companies failed to disclose to Plaintiffs the amount of risk involved in the project, specifically never providing them with a private placement memorandum as required by securities law;

e. Defendant MIP failed to disclose that it did not have the cash to make the payments required pursuant to the credit partner agreements;

f. Defendants MIP, WSS/ Tri Global, Northshore Investments, and the individuals associated with these companies failed to disclose to Plaintiffs the true value of the undeveloped lots in the Branson project.

561.    Defendants accomplished these violations by utilizing means of interstate commerce such as emails and letters sent through the United States Postal Service.

562.    Plaintiffs have been damaged in an amount to be proven at trial, but not less than an amount which includes the missed payments, the interest payments

made by Plaintiffs, the penalties assessed by the banks for the late payments, and

the total amount due to the banks to close out the financing, plus a compensatory

amount for the damage done to Plaintiffs' credit due to Defendants' fraudulent

representations.

563.     Defendants also violated Section 10(b) of the Exchange Act (15

USC §78(j)(b)) which states it shall be unlawful for any person to, by

means or instrumentalities of interstate commerce:

> To use or employ, in connection with the purchase or sale of any
> security registered on a national securities exchange or any
> security not so registered, or any securities-based swap agreement
> (as defined in section 206B of the Gramm-Leach-Bliley Act), any
> manipulative or deceptive device or contrivance in contravention
> of such rules and regulations as the Commission may prescribe as
> necessary or appropriate in the public interest or for the protection
> of investors.

564.     Defendants breached this section of the Exchange Act by using means of

interstate commerce to accomplish the fraudulent and deceptive practices outlined

above in this Complaint.

565.     Plaintiffs have been damaged by Defendants' fraudulent and deceptive

practices in an amount to be determined at trial, but not less than an amount which

includes the missed payments, the interest payments made by Plaintiffs, the

penalties assessed by the banks for the late payments, and the total amount due to

the banks to close out the financing, plus a compensatory amount for the damage

done to Plaintiffs' credit due to Defendants' fraudulent representations.

//

## EIGHTH CAUSE OF ACTION
### (State Securities Fraud)

566.     Plaintiffs hereby incorporate and re-allege all previous paragraphs of this

Complaint as though fully set forth herein.

567.     As is more fully explained in Plaintiffs theories of liability, all Defendants

are liable for State Securities Fraud under respondeat superior and civil

conspiracy theories of liability.

568.     Section 61-1-1 of the Utah Uniform Securities Law provides that:

It is unlawful for any person, in connection with the offer, sale or purchase
of any security, directly or indirectly to:

   i.   employ any device, scheme, or artifice to defraud;
  ii.   make any untrue statement of a material fact or to omit to
state a material fact necessary in order to make the
statements made, in the light of the circumstances under
which they are made, not misleading; or
 iii.   engage in any act, practice, or course of business which
operates or would operate as a fraud or deceit upon any
person.

569.     Section 61-1-2(1) of the Utah Uniform Securities Law provides

that:

It is unlawful for any person who receives any consideration from
another person primarily for advising the other person as to the
value of securities or their purchase or sale, whether through the
issuance of analyses or reports or otherwise, to:

  1.   employ any device, scheme, or artifice to defraud
the other person;
  2.   engage in any act, practice, or course of business
which operates or would operate as a fraud or deceit
upon the other person.

570.     All of the Defendants named in this Complaint violated §61-1-1 by

making untrue statements about the value of the securities they were

offering.  These statements consist of:

    a.  Defendants MIP, McCleery, Burton, WSS/ Tri Global, Drake and Snider

        made multiple representation to Plaintiffs in the form of emails and

        newsletters on the dates listed in the general allegations section of this

        Complaint which led Plaintiffs to believe that construction was

        progressing in accordance with the draws being made on the construction

        loans;

    b.  Defendants MIP, McCleery and Clarkson made representations that the

        information contained in the contracts with MIP and WSS/ Tri Global did

        not need to be revealed to the banks providing financing for the project by

        Plaintiffs and that all arrangements with the banks would be made by

        Clarkson.  The representations were made in emails and letters on the

        dates outlined in the general allegations section of this Complaint;

    c.  Defendants MIP, McCleery and Clarkson represented to Plaintiffs that the

        banks were fully aware of the payment structure and that the banks were

        in complete accord with those arrangements.  These representation were

        made in emails on the dates listed in the general allegations section of this

        Complaint;

    d.  Defendants MIP, McCleery, Clarkson, WSS/ Tri Global, Drake, Snider,

        and Charger Title represented to Plaintiffs that no money would be

        required at closing.  These representations were made in emails on the

dates listed in the general allegations section of this Complaint;

    e.    Defendants MIP, McCleery, Clarkson, WSS/ Tri Global, Drake and Snider all made representations that all obligations on the loans had been paid in full pursuant to the agreements entered into between Plaintiffs and Defendants. These representations were made in emails on the dates listed in the general allegations section of this Complaint.

571.    All of the Defendants named in this Complaint violated §61-1-2(1) by accepting consideration for advising Plaintiffs as to the value of the securities being offered.

572.    While providing these "services" to Plaintiffs, Defendants engaged in fraudulent acts and practices by providing false information to Plaintiffs as outlined in the above sections of this Complaint.

573.    Defendants also violated §61-1-1 by failing to disclose the following material facts regarding the investment opportunity on the Branson project:

    a.    Defendants MIP and WSS/ Tri Global, and the individuals associated with these entities failed to disclose the full extent of the relationship between MIP and WSS/ Tri Global and any profits sharing which was taking place between the companies;

    b.    Defendants MIP, WSS/ Tri Global, Northshore Investments, and the individuals associated with these entities failed to disclose the fact that WSS/ Tri Global and Northshore Investments were owed and managed by the same principles which resulted in the purchase price on the property

going to the same company which was to complete the construction on the
property;

c.  Defendants MIP, WSS/ Tri Global, and the individuals associated with
these companies failed to disclose to Plaintiffs that the loan disbursements
which were to be used for construction on the project were also used to
make the interest payments on the construction loans;

d.  Defendants MIP, WSS/ Tri Global, and the individuals associated with
these companies failed to disclose to Plaintiffs the amount of risk involved
in the project, specifically never providing them with a private placement
memorandum as required by securities law;

e.  Defendant MIP failed to disclose that it did not have the cash to make the
payments required pursuant to the credit partner agreements;

f.  Defendants MIP, WSS/ Tri Global, Northshore Investments, and the
individuals associated with these companies failed to disclose to Plaintiffs
the true value of the undeveloped lots in the Branson project.

574.    By reason of the foregoing, Defendants directly violated §61-1-1 and §61-
1-2(1) of the Utah Securities Act and thereby harmed Plaintiffs in an amount to be
proven at trial, but not less than an amount which includes the missed payments,
the penalties assessed by the banks for the late payments, and the total amount
due to the banks to close out the financing, plus a compensatory amount for the
damage done to Plaintiffs' credit due to Defendants' fraudulent representations.

//

## NINTH CAUSE OF ACTION
### (Unjust Enrichment)

575.     Plaintiffs hereby incorporate and re-allege all previous paragraphs of this

Complaint as though fully set forth herein.

576.     Plaintiffs provided a significant amount of money to Defendants in the

form of draws taken on the construction financing put in place by Plaintiffs for the

Branson project.

577.     The draws made on these accounts by Defendants created a serious

detriment and obligation on Plaintiffs.

578.     To date, Defendants have not provided services which coincide with the

amounts drawn on the construction accounts.

579.     As a result, Plaintiffs have been harmed in the amounts drawn on those

accounts as the amount of construction completed is drastically less than the

amount drawn on the accounts.

580.     Therefore, equity demands that Defendants be required to repay to

Plaintiffs the amount drawn on the construction accounts.

### (Unjust Enrichment specifically against Clarkson)

581.     Plaintiffs hereby incorporate and re-allege all previous paragraphs of this

Complaint as though fully set forth herein.

582.     Defendant Clarkson received commissions from his work as a loan officer

in processing the loans which constitute the basis of this action.

583.     Defendant Clarkson should only have been entitled to receive these

commissions if the loans were prepared and processed correctly.

584.     Defendant Clarkson incorrectly prepared the loan documentations and therefore did not earn the commissions which he has taken.

585.     As a result Defendant Clarkson has been unjustly enriched at the detriment of Plaintiffs.

586.     Therefore, equity demands that Defendant Clarkson be required to repay to Plaintiffs any and all amounts he received as commissions for his work as loan officer for the Plaintiffs.

**TENTH CAUSE OF ACTION**
**(Conversion)**

587.     Plaintiffs hereby incorporate and re-allege all previous paragraphs of this Complaint as though fully set forth herein.

588.     Plaintiffs owned or possessed the right to the funds distributed from the construction loans to WSS/ Tri Global.

589.     WSS/ Tri Global intentionally interfered with Plaintiffs' right to those funds, or the structures which were to be completed with those funds, by failing to perform the construction of the duplexes as represented.

590.     WSS/ Tri Global's actions have deprived Plaintiffs of possession or use of said property.

591.     WSS/ Tri Global's actions have caused damage to Plaintiffs in an amount which includes the missed payments, the penalties assessed by the banks for the late payments, and the total amount due to the banks to close out the financing.

//

//

## ELEVENTH CAUSE OF ACTION
### (Intentional Interference with an Established Business Relationship)

592.    Plaintiffs hereby incorporate and re-allege all previous paragraphs of this Complaint as though fully set forth herein.

593.    Defendants WSS/Tri-Global, David Drake, and Don Snider improperly interfered with Plaintiffs' established business relationship with the lending institutions which issued the construction loans.

594.    Defendants WSS/Tri-Global, Drake, and Snider Intentionally made draws on construction loans obtained by Plaintiffs.

595.    Plaintiffs and their lending institutions understood that these draws were to be used to make improvements and construct dwellings on Plaintiffs' lots in the Branson, MO area.

596.    WSS/ Tri Global, Drake, and Snider willfully used construction loan draws for purposes other than constructing improvements on Plaintiffs lots.

597.    WSS/ Tri Global, Drake, and Snider's willful conduct constitutes an intentional interference with the established business relationship existing between Plaintiffs and their various lending institutions.

598.    WSS/ Tri Global, Drake, and Snider's intentional interference has resulted in Plaintiffs loans with their lending institutions being called due.

599.    Due to WSS/ Tri Global, Drake, and Snider's intentional interference, Plaintiffs are unable to demonstrate to their lending institutions that they have obtained value equivalent to the amounts disbursed from the construction loan.

600.    WSS/ Tri Global, Drake, and Snider's intentional interference has resulted

in the collapse of all business relations between Plaintiffs and their lending institutions.

601.    WSS/ Tri Global, Drake, and Snider's actions have caused damage to Plaintiffs in an amount which includes the missed payments, the penalties assessed by the banks for the late payments, and the total amount due to the banks to close out the financing.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment as to the causes of action set forth above and against Defendants as follows:

1. For repayment of all funds drawn out of the construction loans obtained through the use of Plaintiffs' credit;

2. For repayment of all loan payments made by Plaintiffs in an attempt to protect their credit;

3. For damages resulting from Defendants' fraudulent representations associated with the sale of securities in an amount to be proven at trial, but that amount in no way will be less than an amount which includes the missed payments, the penalties assessed by the banks for the late payments, and the total amount due to the banks to close out the financing, plus a compensatory amount for the damage done to Plaintiffs' credit, and treble damages of that amount pursuant to Utah Code Annotated § 61-1-22(2);

4. For attorneys' fees and costs associated with bringing this action pursuant to Utah Code Annotated § 61-1-22(2);

5. For punitive damages pursuant to Utah Code Annotated § 78B-8-201(1)(a) in an amount deemed appropriate by the Court;

6. For such other relief as the Court deems just and appropriate.

DATED AND SIGNED this _____ day of July, 2009.

ASCIONE & ASSOCIATES, LLC

_____
PATRICK J. ASCIONE
Attorney for Plaintiffs
