IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| GREG ARNSON, et. al.,<br><br>　　　　　　　　　Plaintiffs,<br><br>v.<br><br>MY INVESTING PLACE L.L.C, et al.,<br><br>　　　　　　　　　Defendants. | **MEMORANDUM DECISION AND ORDER DISMISSING CASE FOR LACK OF SUBJECT MATTER JURISDICTION AND DENYING MOTION TO AMEND COMPLAINT.**<br><br>Case No. 2:09-CV-254 DN<br><br>District Judge David Nuffer |

Plaintiffs have many motions pending.  The district judge has held hearings[1] while the case was referred to him as a magistrate judge to determine whether default judgments could be entered against many Defendants.  At a hearing held May 31, 2011, the court questioned whether any instruments involved in this case constituted securities, a prerequisite for a violation of the securities laws.[2]  Consequently, the court allowed plaintiffs to file a memorandum addressing the issue of the court's subject matter jurisdiction.[3]  Plaintiffs filed their memorandum with supporting evidence on June 20, 2011.[4]

### Allegations in this Case

Plaintiffs allege that Defendants engaged in a scheme by which they offered for sale lots in a resort Defendants were developing in Missouri.  The resort was to contain duplexes, luxury residential units, a golf course, a water park, shopping, and other amenities.  Plaintiffs took title to the lots and on the strength of their credit obtained construction financing for the duplexes to

---

[1] See Minute Entry, docket no. 228, filed March 17, 2011; Minute Order, docket no. 251, filed May 31, 2011.

[2] Minute Order, docket no. 251, filed May 31, 2011.

[3] *Id.*

[4] Memorandum of Points and Authorities Supporting Subject Matter Jurisdiction (Jurisdiction Memorandum), docket no. 261, filed June 20, 2011.

be built on the lots in exchange for Defendants' promise to pay a flat fee of $5,000 for each

duplex financed.  Defendants were to make the payments on the loans and clear Plaintiffs' credit

by either selling the units after they were built or by refinancing the loans.  Defendants failed to

develop the project as promised and did not make the required payments on the construction

loans.  The loans went into default, leaving plaintiffs obligated for the construction financing and

with damaged credit.  Plaintiffs allege that Defendants violated the federal securities laws.

Plaintiffs assert that this court has subject matter jurisdiction under 28 U.S.C. § 1331

based upon the alleged securities fraud.[5]  After careful consideration, the court concludes that the

investments at issue do not constitute "securities" as contemplated by the federal securities acts,

and therefore, this court lacks subject matter jurisdiction.

## BACKGROUND[6]

1.      My Investing Place ("MIP"), Western Site Services/Tri Global, and David Drake

and Don Snider, owners of WWS/Tri Global, set up the actual investment in Indian Ridge Resort

Community ("IRRC") as an investment scheme. The scheme essentially involved using Plaintiffs'

credit to finance construction of several duplexes in the IRRC. Each Plaintiff participated as a

"credit partner," wherein they were required to take out construction loans in order to provide

financing for the construction of individual units.

2.      As credit partners, Plaintiffs were not required to make any financial outlay

other than the use of their credit, and a $3,000 reservation fee per unit (half duplex), which itself

was to be refundable once financing was successfully secured. Moreover, all payments—the

---

[5] Third Amended Complaint at 6-7, ¶ 36, docket no. 154, filed October 25, 2010.

[6] The facts are taken directly from Plaintiffs' Jurisdiction Memorandum at iii-x.  The original paragraph numbering
has been retained.

mortgage and interest payments, the initial down payment, and closing costs on all loans—would be made by WSS/Tri Global or other third parties.

3.      Upon completion, which WSS/Tri Global represented to Plaintiffs would only take approximately four months, the units would be sold and the balance of the construction loans repaid with the funds from the sale.

4.      WSS/Tri Global and other third parties managed all aspects of construction, financing and loan qualification, and marketing and resale of the financed units to secondary potential buyers.

5.      In return for taking out these loans, Plaintiffs and other prospective investors would receive $5,000.00 for each individual unit ($10,000.00 for each duplex) they financed.

6.      According to the Real Estate Partner Agreement ("Agreement"), each Plaintiff "proceeded with an application for a mortgage on real property in [Plaintiff's] name and under [Plaintiff's] social security number and credit." Each Plaintiff acknowledged an understanding that "this mortgage [would] be recorded in county records and on [Plaintiff's] credit information." Thus, although Defendants agreed to make interest payments and to pay off the loans upon completion, Plaintiffs accepted nearly all the financial risk involved in the partnership. If—and when—Defendants failed to make payments, the ramifications would—and did—fall entirely on Plaintiffs.

7.      Defendants made numerous representations to Plaintiffs that this was an investment. At no time was it contemplated that Plaintiffs would be purchasing the units outright. This arrangement is evidenced in the Agreement:

> Title: Partner understands and agrees that title to the property will be held in the name of the partner and My Investing Place, L.L.C. Partner shall sign and [sic] documents or deeds to effectuate the addition of title to My Investing Place, L.L.C. at closing. Partner shall have NO rights or access whatsoever to

the property. Partner may NOT place any liens on the property or use property
for any securitized credit or collateral.

Bankruptcy: In the event of [sic] Partner files for bankruptcy in any court,
Partner understands and agrees that Partner has no equity position and no
remainder of equity in the Property, that all equity and rights to proceeds
belongs [sic] solely and exclusively to Principal, and that Property shall NOT
be listed as an asset of Partner or attached in any bankruptcy proceeding.

Property Disposition:  Principal will dispose of the property either by
outright sale or, in the alternative, removal of the mortgage under Partner's
name and credit by refinancing the loan no sooner than One (1) month and no
longer than fifteen (60) [sic] months dated from the initial closing on the
property. Partner hereby understands and agrees not to prohibit the
disposition of the property.

Property Proceeds: All proceeds from the disposition of the property shall be
due to and owned by My Investing Place, L.L.C. Partner shall have no rights in
or to any proceeds, cash or otherwise, resultant from improvements, appreciation
or any other accrual on the property. Partner shall execute, at Principal's request,
any further documentation required to validate Principal's right to proceeds.
Partner hereby understands and agrees to relinquish any and all current or future
rights to any and al [sic] proceeds derived from the disposition of the property.

Per the Agreement, Plaintiffs would simply be financing the construction, with Defendants

promising a fixed return.

8.     MIP, WSS/Tri Global, and Drake and Snider pitched this scheme to

Plaintiffs at a series of promotional meetings held in Sandy, Utah, in late 2006 and early

2007. At these meetings, Drake and Snider made representations to each of the Plaintiffs

regarding the investment they would be making.

9.     Among these representations were descriptions of various amenities available

within the Indian Ridge Resort Community ("IRRC") that, Defendants explained, would boost

the value of the property by making the IRRC a destination resort.

10.     Shirato and the Indian Ridge Entity Defendants were instrumental in pitching the

investment scheme.

* * * *

4

12.     Also included in promotional materials published by Shirato and the Indian Ridge Entity Defendants were representations that the following amenities were included in the IRRC:  [a golf course; a lifestyle center consisting of themed retail shopping and professional offices, upscale restaurants, a fitness club and day spa, and a courtyard; indoor/outdoor water parks; and a full service resort hotel].

13.     These promotional materials showed Tract 34, where all of Plaintiffs' lots and units are located, as part of Phase I of the IRRC.

14.     Shirato and the Indian Ridge Entity Defendants put together and released an Interactive Promotional DVD to encourage investment in the IRRC.

        * * * *

19.     Shirato presented the promotional materials to Drake and Snider, and My Investing Place, on his and the Indian Ridge Entity Defendants' behalf. He did so for the purpose of soliciting investments in the IRRC from My Investing Place's clients.

20.     Mr. Shirato and the Indian Ridge Entity Defendants presented the information contained in these promotional materials to Plaintiffs, through Drake and Snider, in an attempt to persuade them to invest in the IRRC.

21.     At the Sandy, Utah, promotional meetings, Drake and Snider discussed the IRRC as well as Shirator's [sic] success in previous projects. They did so to promote the soundness of the investment scheme.

22.     Based on the several representations made by Defendants, each Plaintiff entered into the Agreement with MIP. Under the express terms of said agreements, Plaintiffs did not receive full control and ownership of the properties they would be financing. Instead, Plaintiffs agreed to hold title with MIP, and further acknowledged that all equity belonged to MIP.

23.     Plaintiffs invested in Defendants' scheme solely to realize a profit. At no point did any individual Plaintiff view this as a simple real estate purchase in which Defendants were simply building a residence for Plaintiffs' own use and enjoyment.

## DISCUSSION

### A.  Subject Matter Jurisdiction

Before a federal court may consider the merits of a case, it must first determine whether it has subject matter jurisdiction.[7]  Thus, the court is "obliged to inquire sua sponte whenever a doubt arises as to the existence of federal jurisdiction."[8]  If the court determines that subject matter jurisdiction is lacking, the court must dismiss the action.[9]

In this case, Plaintiffs allege federal question jurisdiction under 28 U.S.C. § 1331 based upon alleged violations of the Securities Act of 1933 and the Securities Exchange Act of 1934. However, if the "investments" at issue in this case do not constitute "securities" within the meaning of the securities laws, this court would lack jurisdiction over the subject matter since no federal question would exist.  Subject matter jurisdiction in this case may not be based upon diversity under 28 U.S.C. § 1332, because the parties are not completely diverse.

The court is aware of decisions holding that the existence of a security is a factual question that cannot be determined at a preliminary stage, such as on a motion to dismiss, solely through the allegations in the complaint.[10]  In this case, however, the court has before it voluminous material submitted by the Plaintiffs including contracts, promotional materials,

---

[7] *In re Aramark Leisure Servs.* 523 F.3d 1169, 1173 (10th Cir. 2008).

[8] *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 278 (1977).

[9] Fed. R. Civ. P. 12(h)(3).

[10] *See, e.g., Aldrich v. McCulloch Props., Inc.*, 627 F.2d 1036, 1038-40 (10th Cir. 1980).

correspondence, sworn declarations of the Plaintiffs and other persons, and other materials.[11] The court has had the benefit of lengthy explanation by counsel of the Plaintiffs' allegations and the justification for their claims. The court is considering everything submitted by the Plaintiffs and is taking all inference in Plaintiffs' favor. The court therefore has sufficient factual information to decide the issue.

The 1933 and 1934 Acts use slightly different formulations to define the term "security," but the Supreme Court has held that the definitions are essentially identical in meaning.[12] Under the Acts, the term "security" means "any note, stock, treasury stock, security future, bond, debenture, . . . investment contract, . . . [or any] instrument commonly known as a 'security.'"[13] Plaintiffs argue that the contracts that they entered into constitute "investment contracts," or in the alternative "notes," within the meaning of the securities laws, thereby conferring subject matter jurisdiction on this court.[14]

**1. Investment Contracts**

The fundamental purpose of the Securities Acts was to eliminate serious abuses in the securities markets.[15] To accomplish that goal, Congress defined the term "security" broadly to encompass "the many types of instruments that in our commercial world fall within the ordinary concept of a security."[16] In so doing, however, Congress did not "intend to provide a broad federal remedy for all fraud."[17] In interpreting the term "security," courts should consider "the

---

[11] See Exhibits 1-6, Exhibits A-O, attached to Plaintiffs' Jurisdiction Memorandum; Exhibits 1-37 to Plaintiffs' Supplemental Memorandum Re: 03/17/2011 Hearing on Default Judgment, docket not 244, filed May 9, 2011.

[12] *SEC v. Edwards*, 540 U.S. 389, 393 (2004); *Reves v. Ernst & Young*, 494 U.S. 56, 61 n.1 (1990).

[13] *Edwards*, 540 U.S. at 393 (alterations in original). The definitions are found at 15 U.S.C. § 77b(a)(1) for the 1933 Act and 15 U.S.C. § 78c(a)(10) for the 1934 Act.

[14] Jurisdiction Memorandum at 1.

[15] *Reves*, 494 U.S. at 60; *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 849 (1975).

[16] *Reves*, 494 U.S. at 61 (quoting *Forman*, 421 U.S. at 847-48).

[17] *Reves*, 494 U.S. at 61 (quoting *Marine Bank v. Weaver*, 455 U.S. 551, 556 (1982)).

economics of the transaction under investigation" and take care not to place form over substance.[18]

Real estate, even when purchased as an investment, ordinarily is not considered to be a security.[19] "A piece of real estate . . . has an inherent worth, a worth not solely dependent on the efforts of a promoter. For this reason, real estate transactions are not in and of themselves governed by the federal securities laws."[20]

The term "investment contract" is not defined in the Securities Acts.[21] In *SEC v. W.J. Howey Co.*,[22] the Supreme Court created a three-part test to determine whether an instrument is an investment contract. Under this test, "investment contract" means "a contract, transaction or scheme" involving (1) an investment of money, (2) in a common enterprise, (3) with an expectation of profits to be derived solely from the efforts of others.[23] In *Howey*, promoters sold narrow strips of orange groves arranged so that an acre consisted of forty-eight trees. Most of the purchasers bought less than five acres. In addition, the purchasers were offered a "service contract," under which an affiliate of the seller would cultivate the groves, and harvest and market the crops. The company then would allocate the net profits among the investors.[24]

The Court concluded that the transactions at issue constituted investment contracts.[25] The Court stated that the defendant companies "are offering something more than fee simple interests in land, something different from a farm or orchard coupled with management services.

---

[18] *Reves*, 494 U.S. at 61; *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967).

[19] 1 Thomas Lee Hazen, *Law of Securities Regulation*, § 1.6[9], at 127 (6th ed. 2009).

[20] *Bender v. Cont'l Towers Ltd. P'ship*, 632 F. Supp. 497, 501 (S.D.N.Y. 1986).

[21] *Edwards*, 540 U.S. at 393; *SEC v. W.J. Howey Co.* 328 U.S. 293, 299 (1946).

[22] 328 U.S. 293 (1946).

[23] *Id.* at 298-99, 301.

[24] *Id.* at 294-97.

[25] *Id.* at 299.

They are offering an opportunity to contribute money and to share in the profits of a large citrus fruit enterprise managed and partly owned by" the defendants.[26]  The Court noted that individual development of the tracts of land would not have been economically feasible due to their small size.  The tracts had utility as citrus groves only when cultivated and operated as components of the larger area.  The Court stated, "A common enterprise managed by [defendants] or third parties with adequate personnel and equipment is therefore essential if the investors are to achieve their paramount aim of a return on their investments."[27]

Plaintiffs assert that the investment scheme at issue in this case satisfies the *Howey* test for an investment contract.  They state that the investment element is met because they invested money in the scheme.  Plaintiffs seem to contend that the $3,000 fee they provided up front constituted an investment allowing them to participate in the investment scheme.[28]  However, it is clear that the $3,000 payment was merely a refundable deposit to reserve a lot, a common arrangement in real estate transactions.  The court nevertheless concludes that the use of Plaintiffs' credit to obtain the loans could satisfy the first part of the *Howey* test.

However, the second element or "common enterprise" prong of the *Howey* test is not satisfied.  In determining whether a "common enterprise exists, the Tenth Circuit considers the "economic reality" of the transaction.  If "a transaction is in reality an investment (that is, a transaction of a type in which stock is often given), then it creates a 'common enterprise' and gives rise to a 'security' falling within the ambit of the 1933 and 1934 Securities Acts"[29]  The investments in this case do not constitute a "common enterprise" under the "economic reality" test.  Clearly, they were not the type of investments in which stock is often given.  Plaintiffs did

---

[26] *Id.*

[27] *Id.* at 300.

[28] Jurisdiction Memorandum at 4.

[29] *McGill v. American Land & Exploration Co.*, 776 F.2d 923, 925-26 (10th Cir. 1985).

not purchase shares in Defendants' enterprise.  The investments are very different from the investment contracts found to exist in *Howey*.  Rather, these investments were the purchase of lots and the taking out of construction loans to construct housing units on those lots.  Such transactions are commonplace in real estate, and are not considered investments in securities.  To consider these transactions to be investment contracts would bring every lot purchase and construction loan within the purview of the securities laws, a circumstance surely not contemplated by the federal securities acts.

In *Woodward v. Terracor*, a case with similar facts, the plaintiffs purchased individual lots in a planned residential community in Tooele, Utah.  In promoting the sales of the individual lots, the developers represented that the development would eventually become a self-sufficient community.[30]  In addition to residential units, the plans included "shopping centers, health and cultural facilities, transportation facilities, and abundant recreational opportunity, including a golf course and lake."[31]  The plaintiffs each purchased individual building lots as future building sites, although several of the plaintiffs indicated that they themselves did not plan to actually build on the sites and only bought them as an "investment."[32]  In the plaintiffs' view, the project did not go as expected.  The plaintiffs stated that progress on the project had been slow and the project was "dying on the vine."[33]  They alleged fraud based upon "an alleged misrepresentation by the defendants as to their financial ability to carry the project to full completion."[34]

The issue in *Woodward* was whether the purchase by the plaintiffs of the subdivision lots constituted an "investment contract" and thereby brought the transactions within the ambit of the

---

[30] *Woodward v.Terracor*, 574 F.2d 1023, 1024-25 (10th Cir. 1978).

[31] *Id.* at 1025.

[32] *Id.*.

[33] *Id.*

[34] *Id.*

federal securities laws.[35]  The Tenth Circuit applied the *Howey* test and concluded that no "common enterprise" existed.[36]

The Tenth Circuit stated that the developer itself was engaged in a business venture, the development of a new residential community.  As part of this venture, it sold lots to persons who either planned to build on the property or who intended to resell to others.  "But the mere fact that the plaintiffs bought lots from Terracor does not mean that by such acquisition they were thereafter engaged in a common venture or enterprise with Terracor."[37]  The only contractual agreement between Terracor and the plaintiffs was a standard Uniform Real Estate Contract.  Terracor had no contractual obligation to the plaintiffs other than to deliver title, once the terms of the purchase contract had been met.  Unlike the *Howey* case, the developer defendants were not under any collateral management contract with the purchasers.[38]

The court quoted approvingly from another case in which the plaintiffs contended that they bought lots in a development as an investment expecting the lots to increase in value through the sole efforts of the promoters:

> If defendants in fact built roads and other improvements, this is not the type of managerial service contemplated in *Howey* or *United Housing*.  Defendants did not promise to run the development and distribute profits to the plaintiff, as did the operators of the orange groves in *Howey*.  There was no management contract between plaintiff and defendants, nor were defendants obligated by the Purchase Agreement to perform any such services.[39]

---

[35] *Id.* at 1024.

[36] *Id.* at 1025-27.

[37] *Id.* at 1025.

[38] *Id.*

[39] *Id.* at 1026 (quoting *Davis v. Rio Rancho Estates, Inc.*, 401 F. Supp. 1045, 1050 (S.D.N.Y. 1975)) (citations omitted).

The Tenth Circuit concluded that "[i]n the absence of a 'common enterprise' between the parties, the expectation of a profit on resale is insufficient to transform what is essentially a sale of real property into the sale of an investment contract."[40]

Other courts similarly have found that real estate transactions are not securities unless there is a collateral agreement such as a rental pool agreement giving rise to an expectation of profits.[41]  These decisions are based upon an SEC release which states, "The offer of real estate as such, without any collateral arrangements with the seller or others, does not involve the offer of a security."[42]  As examples, the SEC stated that the offering of condominiums or units of real estate would be viewed as securities in the form of investment contracts where the offering included (1) a rental arrangement with an emphasis on "the economic benefits to the purchaser to be derived from the managerial efforts of the promoter . . . from the rental of the units;"[43] (2) participation in a rental pool arrangement; or (3) "a rental or similar arrangement whereby the purchaser must hold his unit available for rental for any part of the year, must use an exclusive rental agent or is otherwise materially restricted in his occupancy or rental of his unit."[44]  In this case, Plaintiffs did not intend to participate in a collateral arrangement such as a rental pool.

Plaintiffs nevertheless argue, that the "economic reality of the investment scheme is that Defendants sold Plaintiffs a security."[45]  Plaintiff analogize to the *Howey* case, asserting that they had no intention of occupying the units and invested solely to make a quick profit, and relied

---

[40] *Id.*

[41] *Bender*, 632 F. Supp. at 500-02; *Demarco v. LaPay*, No. 2:09-CV-190 TS, 2009 WL 3855704 (D. Utah Nov. 17, 2009) (purchases of Park City condos were not investment contracts); *Alunni v. Dev. Res. Grp., LLC*, 2009 WL 2579319 (M.D. Fla. Aug. 18, 2009).

[42] Guidelines as to the Applicability of the Federal Securities Laws to Offers and Sales of Condominiums or Units in a Real Estate Development, S.E.C. Release No. 33-5347, 38 Fed. Reg. 1735, 1973 WL 158443, at *1 (Jan. 4, 1973).

[43] *Id.* at *3.

[44] *Id.*

[45] Jurisdiction Memorandum at 9.

almost entirely on the efforts of Defendants to develop and manage the project.[46]  They argue that like the investors in *Howey*, they were offered "an opportunity to contribute money and to share in the profits of a large [real estate development] managed and partly owned by [the Defendants.]"[47]  And like the plaintiffs in *Howey*, they resided in distant localities, had no desire to occupy the land, and lacked the equipment and experience to develop it.  They further argue that like the plots of land in Howey, their "plots of land gain utility only when 'developed as component parts of a larger area,' in this case, the IRRC development."[48]

The court concludes, however, that Plaintiffs' real estate purchases more closely resemble the purchases in *Woodward* than those in *Howey*.  Plaintiffs in this case did not invest in the overall project itself, but purchased individual units in the project.  They did not buy the units with the idea of participating in capital appreciation from the improvements made by Defendants or from receiving an income stream from rentals managed by Defendants.[49]  Instead, they were to receive a flat fee for the use of their credit.  As the *Woodward* court observed, the mere fact that Plaintiffs bought lots from Defendants does not mean that they were thereafter engaged in a common enterprise with Defendants.  Although Plaintiffs allege that Defendants offered them the opportunity to share in the profits of a large real estate development, it is clear that Plaintiffs did not anticipate sharing in the profits of the development.  Rather, they expected to receive the $5,000 fee and be out of the deal in a very short time.  The court also disagrees with Plaintiffs' assertion that the lots at issue were similar to the plots of land in *Howey* because they had utility only when developed as part of the larger development.  The lots purchased by

---

[46] Jurisdiction Memorandum at 7.

[47] Jurisdiction Memorandum at 7 (alterations in original)(quoting *Howey*, 328 U.S. at 299).

[48] Jurisdiction Memorandum at 7-8 (quoting *Howey*, 328 U.S. at 300).

[49] *Aldrich*, 627 F.2d at 1039 (stating that "[p]rofits" as used in the investment contract definition may be 'capital appreciation resulting from the development of the initial investment.'") (quoting *United Hous. Found., Inc.*, 421 U.S. at 852.

Plaintiffs were building lots which undoubtedly have some value as such.  Plaintiffs took fee simple title to the lots which they apparently retain today.  Absent the fraud, the transactions in this case were not unlike many run-of-the-mill real estate purchases in which investors buy lots, take out construction loans, expect to resell at a profit, and never intend to occupy the units themselves.  Such transactions do not involve securities, and many cases so hold.

Finally, Plaintiffs argue that this case is controlled by *Berrios-Bones v. Nexidis*[50] in which the defendants moved to dismiss on the ground that the plaintiffs could not prove existence of a "security."[51]  The court in *Berrios-Bones* concluded that a question of fact existed as to whether the investment scheme at issue constituted a security and denied the motion.[52]

Plaintiffs contend that the facts of this case are virtually indistinguishable from *Berrios-Bones*, and that therefore, the Real Estate Partner Agreements in this case constituted "securities."[53]  The court in *Berrios-Bones*, however, did not find that the investments were securities.  It concluded only that the plaintiffs had pled facts sufficient to survive a motion to dismiss.  Although there may be similarities between the facts of this case and those of *Berrios-Bones*, Plaintiffs have presented this court with extensive evidence beyond the mere allegations in the complaint which were considered by the court in *Berrios-Bones*.  Accordingly, the evidence before the court is sufficient for the court to conclude as a matter of law that the investments at issue in this case did not constitute investment contracts.

---

[50] No. 2:07CV193DAK, 2007 WL 3231549 (D. Utah (Oct. 30, 2007).

[51] *Id.* at *4.

[52] *Id.* at *8.

[53] Plaintiffs' Jurisdiction Memorandum at 2-3.

### 2.  Notes

Plaintiffs argue in the alternative that the Real Estate Partner Agreements constitute "notes" as defined by the securities laws.[54]  The court observes that this is a new theory, not raised in the Third Amended Complaint or at any of the previous hearings.  The Third Amended Complaint expressly characterizes the investments at issue as "investment contracts."[55]  Further, the Agreements are not denominated as notes and do not seem to have the characteristics of notes.  The court nevertheless considers the "note" theory.

Plaintiffs argue that the Agreements satisfy the "family resemblance test," formulated by the Supreme Court in *Reves v. Ernst & Young*,[56] to determine whether a "note" is a security.  In *Reves,* the Court considered demand notes issued to members and non-members of a Farmers Cooperative.  The notes were not secured and not insured.  At the time the Cooperative filed bankruptcy, "over 1,600 people held notes worth a total of $10 million."[57]

Under the *Reves* test, the court begins with "a presumption that every note is a security."[58]  The presumption is rebuttable, however, if the note bears a strong family resemblance to any of the notes on a judicially created list deemed not to be securities.[59]  That list was created by considering four "factors that [the] Court has held apply in deciding whether a transaction involves a 'security.'"[60]  Based on those factors, the Court determined the following types of notes are not considered to be securities:  (1) consumer-financing notes, (2) notes secured by a home mortgage, (3) short-term notes secured by a lien on a small business or its

---

[54] Jurisdiction Memorandum at 13-17.

[55] Third Amended Complaint at 7, ¶ 38, Docket no. 154, filed October 25, 2010.

[56] 494 U.S. 56 (1990).

[57] *Id.* at 58-59.

[58] *Id.* at 65.

[59] *Id.*

[60] *Id.* at 66.

assets, (4) notes evidencing a "character" loan to a bank customer, (5) short-term notes secured by an assignment of accounts receivable, (6) notes formalizing an open-account debt incurred in the ordinary course of business, and (7) notes evidencing loans by commercial banks for current operations.[61]

"If an instrument is not sufficiently similar to an item on the list" to say that there is a "strong resemblance," "the decision whether another category should be added is to be made by examining the same factors."[62]  The four factors the Court outlined to be considered in determining whether a particular note bears a resemblance to one of the listed instruments are: First, the court should "examine the transaction to assess the motivations that would prompt a reasonable seller and buyer to enter into it."[63]  Second, the court should consider the "plan of distribution of the instrument to determine whether it is an instrument in which there is common trading for speculation or investment."[64]  Third, the court should examine "the reasonable expectations of the investing public."[65]  Finally, the court should consider whether "some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary."[66]

Plaintiffs assert that the Agreements at issue do not bear a strong resemblance to any of the listed instruments although they most closely resemble a note secured by a mortgage on a

---

[61] *Id.* at 65.

[62] *Id.* at 67.

[63] *Id* at 66..

[64] *Id.* (citations and internal quotation marks omitted).

[65] *Id.*

[66] *Id.* at 67.

home.[67]  The court agrees that no strong resemblance exists between the Agreements and the enumerated instruments and proceeds to the *Reves* analysis using the four factors.

The first factor considers the motivations of the parties in entering into the transaction. "If the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a 'security.'"[68]  On the other hand, if "the note is exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose, . . . the note is less sensibly described as a 'security.'"[69]  Plaintiffs argue that this prong of the *Reves* test is satisfied because Defendants entered into the Agreements to finance the construction of the duplexes.  Further, Plaintiffs' motivation for investing was an expectation of a quick profit at a low risk.  The Agreements were not entered into for "the purchase or sale of a minor asset or consumer good, to correct for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose."[70]  Accordingly, the first part of the test appears to be satisfied since the Defendants' purpose seems to have been to raise money for general use in constructing the units, and Plaintiffs were primarily interested in obtaining a profit.

The second prong of the *Reves* test requires the court to "examine the plan of distribution of the instrument to determine whether it is an instrument in which there is common trading for speculation or investment."[71]  To be considered securities, the notes need not be traded on an

---

[67] Jurisdiction Memorandum at 14.

[68] *Reves*, 494 U.S. at 66.

[69] *Id.*

[70] Jurisdiction Memorandum at 15.

[71] *Reves*, 494 U.S. at 66 (citations and internal quotation marks omitted).

exchange so long as they were "offered and sold to a broad segment of the general public."[72]
Plaintiffs assert that this prong is satisfied because the investors in this case were selected by
MIP from the general public.[73]  However, the court finds that the fact that potential investors
were selected from MIP's clients weighs against a finding that the Agreements were offered and
sold to a broad segment of the general public.  Plaintiffs concede that the Agreements were not
traded on an exchange,[74] and have not suggested that the instruments were traded at all.  The
court observes that it is highly unlikely that there would be any market for the resale of the
Agreements at issue.  Thus, the instruments at issue "were not purchased for any potential
speculative or trading value."[75]  Accordingly, the second part of the *Reves* test is not satisfied.

Under the third *Reves* factor, the court considers the "reasonable expectations of the
investing public."[76]  "The Court will consider instruments to be 'securities' on the basis of such
public expectations, even where an economic analysis of the circumstances of the particular
transaction might suggest that the instruments are not 'securities' as used in that transaction."[77]
Although the scheme in this case was promoted as an "investment," the court concludes that a
reasonable member of the investing public would not have considered these agreements to be
"investments" of the type that would be subject to the securities laws.

The fourth part of the *Reves* test asks whether there are adequate risk-reducing factors
that might suggest the instruments at issue are not securities.  "The existence of other risk-

---

[72] *Reves* 494 U.S. at 68.

[73] Jurisdiction Memorandum at 15-16.

[74] *Id.* at 15.

[75] *Resolution Trust Corp. v. Stone*, 998 F.2d 1534, 1539 (10th Cir. 1993) .

[76] *Reves* 494 U.S. at 66.

[77] *Id.*

reducing factors diminishes the need for protection under the Securities Act."[78]  The Tenth

Circuit has observed that the notes in *Reves* "were uncollateralized, uninsured, and not otherwise

subject to federal regulation."[79]  In this case, however, the "notes" were not uncollateralized

because Plaintiffs took actual title to the property.  The court finds that this was a significant

risk-reducing factor.[80]  Plaintiffs argue, however, that although they did receive title to the lots,

the Agreements required Plaintiffs "to effectuate the addition of title to My Investing Place,

LLC."[81]  Although it is true that the Agreements do state that MIP shall be added to the property

title, no deeds or other instruments were ever executed to effectuate this agreement.  In fact,

Plaintiffs still hold fee simple title to the property.  Further, even if this part of the Agreements

had been carried out, Plaintiffs would still have had joint title with MIP.

The court concludes that the second, third, and fourth *Reves* factors are not satisfied.

Accordingly, Plaintiffs have not shown that the Agreements constitute "notes" under the federal

securities laws.

## B.  Motion for Leave to File Amended Complaint

At the prior hearing held in this case, the court questioned whether it lacked subject

matter jurisdiction.  In an apparent attempt to overcome the jurisdictional problem, Plaintiffs

have filed a motion for leave to amend their complaint which they say is based upon newly

discovered information.[82]  Plaintiffs seek to add new causes of action, one under the civil

Racketeer Influenced and Corrupt Organizations Act (RICO)[83] and one under the Kansas

---

[78] *Resolution Trust Corp.*, 998 F.2d at 1539.

[79] *Id.*

[80] *See id.* (finding a significant risk-reducing factor where notes were collateralized by vehicles).

[81] Jurisdiction Memorandum at 17.

[82] Plaintiffs' Motion to Amend Complaint to Add Additional Federal and State Causes of Action and Parties Based on Newly Discovered Information, docket no. 283, filed November 2, 2011.

[83] 18 U.S.C. §§ 1961-1968.

Consumer Protection Act.,[84] and to add three additional defendants, David Clark, Erin Jewett, and Gerard Lanser.[85]  Defendant Lawrence Bank has filed an opposition to the motion.[86]

Amendment of pleadings is governed by Rule 15(a) of the Federal Rules of Civil Procedure.  In cases such as this one where leave of the court is required to amend, the Rule specifies that the "court should freely give leave when justice so requires."[87]  "A district court should refuse leave to amend 'only [upon] a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment.'"[88]  In the instant case, the court finds that Plaintiffs' motion should be denied on the grounds of undue delay and failure to cure deficiencies by previous amendments.

Plaintiff filed this case on March 20, 2009.  Since then, Plaintiffs have amended their complaint three times.  Thus, counting the original complaint, Plaintiffs have already had four opportunities to adequately state their claims, and are now seeking a fifth.  The court finds that Plaintiffs' failure to cure the deficiencies in their complaint through previously allowed amendments is sufficient reason to deny leave to amend the complaint.

The current motion to amend was filed November 2, 2011, over two and a half years after filing the initial complaint.  It is well settled in the Tenth Circuit that "untimeliness alone [is] a

---

[84] Kan. Stat. Ann. §§ 50-626, 50-627.

[85] Memorandum of Points and Authorities in Support of Plaintiffs' Motion to Amend Complaint to Add Additional Federal and State Causes of Action and Parties Based on Newly Discovered Information (Memorandum in Support of Motion to Amend) at 2, docket no. 284, filed November 2, 2011.

[86] Lawrence Bank's Memorandum in Opposition to Plaintiffs Motion for Leave to File Fourth Amended Complaint (Opposing Memorandum), docket no. 285, filed November 18, 2011.

[87] Fed. R. Civ. P. 15(a)(2).

[88] *Wilkerson v. Shinseki*, 606 F.3d 1256, 1267 (10th Cir. 2010)(quoting *Duncan v. Manager, Dep't of Safety, City & County of Denver*, 397 F.3d 1300, 1315 (10th Cir. 2005)).

sufficient reason to deny leave to amend."[89]  "The longer the delay, 'the more likely the motion

to amend will be denied, as protracted delay, with its attendant burdens on the opponent and the

court, is itself a sufficient reason for the court to withhold permission to amend.'"[90]  Also, it is

appropriate to deny the motion to amend when the party seeking to amend "has no adequate

explanation for the delay."[91]  "Furthermore, '[w]here the party seeking amendment knows or

should have known of the facts upon which the proposed amendment is based but fails to include

them in the original complaint, the motion to amend is subject to denial.'"

     Plaintiffs assert that their motion to amend is based upon newly discovered information.

As Defendant Lawrence Bank points out, however, each of Plaintiffs' new claims and new

parties were known to Plaintiffs, or should have been known, at the time they filed their original

complaint.[92]

     In an attempt to support their claim that their motion is based on newly discovered

information, Plaintiffs state that through the discovery process, they "have a more clear

understanding of how Defendants operated their scheme so as to provide additional theories of

recovery."[93]  The court finds this vague explanation unconvincing.  Although Plaintiffs may now

have a clearer understanding of their case, their new claims are based upon actions which

occurred in 2007 and 2008, well before the original complaint, and the three amended

---

[89] *Hayes v. Whitman*, 264 F.3d 1017, 1026 (10th Cir. 2001) (quoting *Viernow v. Euripides Dev. Corp.*, 157 F.3d 785, 799 (10th Cir. 1998)); *Duncan*, 397 F.3d at 1315; *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1365 (10th Cir. 1993).

[90] *Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1205 (10th Cir. 2006)(quoting *Steir v. Girl Scouts of the USA*, 383 F.3d 7, 12 (1st Cir. 2004)).

[91] *Id.* at 1206 (quoting *Frank* , 3 F.3d at 1365-66).

[92] Opposing Memorandum at 3.

[93] Memorandum in Support of Motion to Amend at 2.

complaints, were filed.  Further, as Plaintiffs themselves acknowledge, their new claims are based upon essentially the same facts as their other claims.[94]

Plaintiffs also seek to add new defendants.  At least one of the proposed new defendants, David Clark, an employee of Defendant Lawrence Bank, was well known to Plaintiffs early in the case.  In fact, Plaintiffs' Third Amended Complaint contains numerous allegations against Clark,[95] but failed to name him as a defendant.  The court finds that Plaintiffs have not provided an adequate explanation for the delay.[96]  The court further finds that Plaintiffs could and should have brought their new claims at the time they filed their original complaint or when they filed their three amended complaints.[97]

Finally, and perhaps most importantly, Plaintiffs' motion to amend to add a civil RICO claim appears to be an attempt to provide a basis for this court's subject matter jurisdiction.  As the Tenth Circuit has observed, however, courts "do not favor permitting a party to attempt to salvage a lost case by untimely suggestion of new theories of recovery."[98]

---

[94] See Memorandum in Support of Motion to Amend at 4.

[95] Third Amended Complaint at 21, ¶¶ 112-114; 26-27 ¶¶ 145-47; 28, ¶¶ 152-53; 49, ¶ 335; 52, ¶ 359; 70, ¶ 528; 72, ¶ 550; 76, ¶ 584-85; 77, ¶ 593; 80, ¶ 630; 81 ¶¶ 632-33; 82, ¶ 642.

[96] *Minter*, 451 F.3d at 1206.

[97] *See McKnight v. Kimberly Clark Corp.* 149 F.3d 1125, 1130 (10th Cir. 1998) (upholding denial of motion to amend where "plaintiff was aware of all the information on which his proposed amended complaint was based [and he] offered no explanation for the undue delay.")

[98] *Hayes v. Whitman*, 264 F.3d 1017, 1027 (10th Cir. 2001) (quoting *Viernow v. Euripides Dev. Corp.*, 157 F.3d 785, 800 (10th Cir. 1998)); *Minter*, 451 F.3d at 1206 (court may properly deny motion to amend "when it appears that the plaintiff is using Rule 15 to make the complaint a moving target, [or] to salvage a lost case by untimely suggestion of new theories of recovery") (internal citations and quotation marks omitted)).

## ORDER

Plaintiffs' motion to amend their complaint[99] is **DENIED**, and the case is **DISMISSED** for lack of subject matter jurisdiction.  All other pending motions are terminated as moot.[100]

Dated June 7, 2012.

BY THE COURT:

David Nuffer
United States District Judge

---

[99] Docket no. 283, filed November 2, 2011.

[100] The motions to be terminated as moot include Defendant Vickie Drake's Motion to Dismiss, docket no. 136, filed August 26, 2010; Motion for Default Judgment Against Western Site Services, LLC, Tri Global Development, LLC, Tri Global Trading Co., LLC, North Shore Investments, LLC, docket no. 199, filed February 15, 2011; Motion for Partial Summary Judgment Against David Drake, Don Snider and Dave Burton, docket no. 236, filed April 26, 2011; Plaintiffs' Motion for Entry of Default, docket no. 252, filed June 2, 2011; Motion to Compel Discovery from Defendant Don Snider, docket no. 254, filed June 8, 2011; Motion to Compel Discovery from Defendant David Drake, docket no. 256, filed June 8, 2011; Joint Motion to Modify Scheduling Order, docket no. 309, filed May 22, 2012.